**Willard BARRY and Harriet Barry, Plaintiffs-Appellants,**

**v.**

**UNITED STATES of America, Defendant-Appellee.**

No. 73–1858.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 1, 1974.

Decided Aug. 5, 1974.

Willard Barry, Cleveland, Ohio, for appellants; John Kennedy Lynch, Cleveland, Ohio, on brief.

Lawrence Ross, Tax Div., Dept. of Justice, for appellee; Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Donald H. Olson, Charles R. Burnett, Attys., Tax Div., Dept. of Justice, Washington, D. C., on brief; Frederick M. Coleman, U. S. Atty., of counsel.

Before WEICK, McCREE and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

Taxpayers Willard Barry and his wife Harriet M. Barry appeal from that part of a judgment of the United States District Court for the Northern District of Ohio which denied their claim for a refund of income taxes based upon claimed depreciation for the years 1959 and 1960 and upon a claimed loss resulting from demolition in 1960. The taxpayers had sought unsuccessfully to take depreciation in those years on a commercial building owned by them and located in downtown Colorado Springs, Colorado. They were likewise unsuccessful in claiming a loss due to demolition when the building was torn down.[1] Harriet Barry had inherited the property by specific devise from her mother Louie N. Mullin when she died on June 1, 1959.

The district court found that all of the value in the Colorado Springs property lay in the land, and that the aging commercial building located upon it was without a separate market value. Consequently, the judge ruled that the building was without separate adjusted basis, within the meaning of § 1014 of the Internal Revenue Code of 1954, from which taxpayers could take depreciation under § 167 or a demolition loss deduction under § 165.[2]

---

1. It is the position of the taxpayers that the building should have been valued for purposes of deducting depreciation in their 1959 and 1960 income tax returns at $40,000, that depreciation on a ten year straight line basis should accordingly have been allowed in the amount of $2,333 for seven months and $3,500 for the ten and one-half months in 1960. They further claim that they were entitled to take a remaining unrecovered cost basis of $34,167 as a loss within the meaning of § 165 of the Internal Revenue Code of 1954, as such loss is further defined in Treasury Regulations § 1.165-3.

2. Pertinent sections of the Internal Revenue Code of 1954 as applicable to this case are as follows:

§ 165.  *Losses.*

(a) *General Rule.*—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise:

(b) *Amount of deduction.*—For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from

The principle issue on appeal is whether the district court correctly determined that the building for which taxpayers claimed depreciation and demolition loss had no value, and therefore afforded taxpayers no basis from which to depreciate or suffer a loss due to demolition.

■ A taxpayer's basis in inherited property is the fair market value of that property at the date of decedent's death or, at the taxpayer's option, at the "alternate valuation date". §§ 1014, 1032, Internal Revenue Code. For purposes of federal estate tax liability, the Barrys elected to take their basis as of the alternate valuation date of June 1, 1960. At that time, it was agreed that the total value of the taxpayers' Colorado Springs real estate was $160,000. However, no breakdown or allocation between land or building was made on the estate tax return. Thus, while the total value of the property is not seriously disputed in this action, for the purpose of assessing the amount, if any, of depreciation and loss deductions allowable to the taxpayers for the building, it was incumbent upon the taxpayer, the Internal Revenue Service, and ultimately the trial court to make a determination of the taxpayers' basis in the building, by allocating the total fair market value of the property between the land and the building.

"Fair market value of property" has been defined as "what a willing buyer would pay in cash to a willing seller". United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943). Likewise, this court has held that the determination of fair market value is a question of fact. Estate of Kreis v. C. I. R., 227 F.2d 753 (6th Cir. 1955). Findings of fact may not, of course, be set aside unless they are clearly erroneous. F.R. Civ.P. 52. Thus, while the facts may be complex and the possible inferences therefrom various, the function of this court is a narrow one—to decide whether the trial court's finding that the building owned by the Barrys had no value—i. e. no fair market value—was clearly erroneous.

Taxpayers' Colorado Springs property had been in Mrs. Barry's family for many years. The exact date of the construction of the building was never accurately established, but the proofs showed that it predated the turn of the century. Basically, the structure was a part two-story and part three-story building, of stone and masonry construction, which occupied all of a lot located at 18–20

the sale or other disposition of property.
§ 167. *Depreciation*
  (a) *General Rule.*—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
    (1) of property used in the trade or business, or
    (2) of property held for the production of income.
            *      *      *      *      *
  (g) *Basis for depreciation.*—The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or other disposition of such property.
§ 1011. *Adjusted basis for determining gain or loss*
  The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections of this subchapter) and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses), adjusted as provided in Section 1016.
§ 1014. *Basis of property, acquired from a decedent.*
  (a) *In general.*—Except as otherwise provided in this section, the basis of property in the hands of a person acquiring the property from a decedent or to whom the property passed from a decedent shall, if not sold, exchanged, or otherwise disposed of before the decedent's death by such person, be the fair market value of the property at the date of the decedent's death, or, in the case of an election under either section 2032 or section 811(j) of the Internal Revenue Code of 1939 where the decedent died after October 21, 1942, its value at the applicable valuation date prescribed by those sections.

South Tejon Street in downtown Colorado Springs. The lot itself was 190 feet in depth, and its 50 foot frontage on South Tejon Street lay some 200 feet south of the intersection of South Tejon and Pikes Peak Avenue, generally recognized as the commercial center of Colorado Springs. While there was a dispute of fact concerning the structural soundness of the building, the proofs supported the finding of the trial court that the building was without an elevator, could not be air-conditioned, and that, in fact, the owners were instructed not to use the upper floors because of non-conformity with various building code requirements.

Louie N. Mullin owned the property until her death on June 1, 1959, at which time she was a resident of Ohio. On September 15, 1954, Mrs. Mullin had entered into a lease of the premises with the Exchange National Bank of Colorado Springs as lessee. The original term of the lease was five years, commencing January of 1955, with an option in the lessee to extend the lease for an additional five years, until January 1, 1965. The lease also gave to the lessee the option at any time during the lease term to demolish the building with no payment required to be made on that account to Mrs. Mullin as lessor. The lease did not, however, require demolition. The lease provided that the Exchange National Bank was to pay a monthly rental of $1,000 and an annual payment of $1,000 toward real property taxes. It placed as conditions on the exercise of the demolition option only that the lessee give prior notification to the lessor by registered mail, and that demolition be done in a good and workmanlike manner at lessee's expense. The lease did not require the construction of any building in place of the demolished building.

On April 23, 1959, the Exchange National Bank exercised its option to extend the lease for the additional five years. In August of 1960, more than one year after Mrs. Mullin's death, the bank exercised its additional option to demolish the building. Demolition was completed by November 15, 1960.

The evidence in the case supported the finding of the trial judge that Exchange National Bank's purpose in entering into the lease in 1954 and exercising its option to renew in 1959 was not to occupy the building as such, but was to retain its possession of the land so that ultimately it could be used for a parking lot and a drive-in teller facility. The property was eventually put to such use under a later lease. Meanwhile, to recoup its rental expenses, the Exchange National Bank put the building to other uses. From March 1955 through December 1956, the building was sublet to the First National Bank at an annual rent of $13,000, the exact amount of Exchange National Bank's annual obligation to the lessor. First National spent $25,000 in improvements on the building for use as a temporary main office in downtown Colorado Springs while it was rebuilding its own building. Thereafter, the building was subleased to Fashion Bar, a women's clothing store which had been required to vacate its prior location because of an expansion of a J. C. Penney Company building. Fashion Bar occupied the premises at the time of Mrs. Mullin's death and thereafter until December of 1959 when it moved to a building which it had purchased.

By the time the dispute came to trial, the building had been gone for more than twelve years, which made valuation more difficult. Nevertheless, the parties presented to the court what we consider to be a classic factual dispute over value which was ultimately resolved by the trial judge adversely to the taxpayers. In addition to the evidence discussed above relating to the uses of the building, the trial court received a wide variety of evidence both from taxpayers and the government on the issue of the fair market value of the building in 1959 and 1960.

Taxpayers offered evidence of value which directly or inferentially might

have supported a separate valuation of the building at an amount ranging from $45,000 to $72,680. Their proofs included an appraisal for insurance purposes at $72,680; evidence that fire insurance in force at the date of death and demolition was carried in the amount of $60,000; evidence that the El Paso County Assessor's Office allocated the total value of the property at 40% for the building and 60% for the land; and their own income tax returns for 1959 and 1960 which placed a value on the building at $54,000 which they later amended to $45,000. In addition, Mrs. Barry testified as owner. of the property that, in her opinion, the building had a value of $60,000 and a remaining useful life of 20 years. The trial judge placed little or no reliance on Mrs. Barry's own valuation. He also gave little credence to the 60/40 allocation of the assessor's office, as the proofs showed that it was a standard formula and was not based upon an appraisal of actual fair market value of the particular property in question.

In our view, the most compelling evidence in favor of the taxpayers was the proof that on the date of Mrs. Mullin's death, the store was actually in use as a dress shop and the lessee was actually paying the sum of $1,000 per month in rent and $1,000 per year toward taxes. Thus, argue the taxpayers, any structure which has a use value of at least $1,000 a month must have a fair market value in addition to the value of the land on which it is located.

The trial judge, however, rejected the evidence of the plaintiffs below in favor of what the taxpayers have in their brief characterized as a:

"1972 hypothetical appraisal of the building . . . by Albert Curry, paid professional 'expert' witness who had never inspected the building . . . [whose] appraisal was based upon prices paid for the acquisition of 5 other downtown real estate parcels, admittedly acquired for development, with no value attributed by Curry to any of the buildings on the acquired parcels, and with no details furnished as to income and expense data for the acquired buildings; so that none of said other buildings was fairly comparable to the building in question."

Accordingly, appellants urge us to hold that the trial judge's findings based upon the expert's testimony are clearly erroneous.

We disagree with the appellants' characterization of the government's proof of value. The trial judge's decision did not rest on so slender a reed as appellants suggest. While it is true that the appraisal by the government's expert was not made until years after the demolition of the building, the appraiser demonstrated that he was exceedingly well qualified and familiar with commercial values of downtown property in Colorado Springs at the times involved.[3] He properly analyzed the value of the subject property from the three traditional approaches [4] and he satisfactorily explained why he rejected the "reproduction costs less accrued depreciation" approach to value for this building,[5] and accepted as most accurate the results reached by use of market data and income analysis.[6]

3. Mr. Curry explained to the court that he had researched the records of the Assessor of El Paso County, which included information as to construction, condition and other factors of the building and other buildings in the area, and also that he talked to individuals who were knowledgeable as to the buildings at the particular time. Mr. Curry's qualifications as an expert real estate appraiser were also fully established in court.

4. Mr. Curry testified that the three traditional approaches are (1) cost less deprecia-

tion, (2) market data, and (3) the income approach.

5. According to Mr. Curry, reproduction cost less accrued depreciation was not an appropriate approach for estimating value in the case of a building over sixty years old.

6. Mr. Curry explained his conclusions based upon the income and market data approach, as follows:

"I indicated earlier, in order for the building to have value, the property had to be

The government's expert witness, Mr. Curry, testified that on the date of inheritance, as well as on the alternate valuation date, the highest and best use of the property was either as vacant land suitable for parking, or suitable and available for the construction of a new commercial building. He further testified and the trial judge accepted his opinion that the old building was a detriment to the overall value of the property. Contrary to the assertion of appellants, the other downtown real estate sales investigated and relied upon by the government expert as comparables, provided convincing support, not only for Mr. Curry's valuation of the property as a whole, but for his conclusion that the entire value of it lay in the land.

■ Neither do we find merit in appellants' assertion that the government's case rested solely upon expert testimony and was, therefore, deficient. Appellants cite in this regard Estate of Kreis v. Commissioner of Internal Revenue, *supra*. In *Kreis*, this court held that the testimony of an expert, alone, was insufficient to compel reversal when the expert's findings conflicted with the findings made by the trial court. *Kreis* is authority for affirming the decision of a trial court when its findings are not clearly erroneous. In so holding, this court noted that the trial judge was not bound to accept the findings of an expert, but *Kreis* did not hold that he was bound to reject them, even as the sole basis for his decision. In any event, the trial judge in this case had additional evidence before him against which to measure that opinion testimony. He had the facts as testified to by the manager of the Fashion Bar, Mr. Levy, relating to the condition of the building at the time. Most importantly, the trial judge had before him evidence of the contemporary treatment of the property at the times involved by those having the responsibility to deal with it, the officers of the Exchange National Bank, Mrs. Mullin, and the taxpayers themselves. This included, of course, the willingness of the Exchange National Bank to rent the property and to take the risk that it might not be able to recoup its rents, solely for the purpose of retaining a right to demolish the building and to use the resultant vacant land for parking. Also convincing to the trial judge and to us was Mrs. Mullin's willing and presumably well informed decision to enter into a relatively short term lease, which, nevertheless, gave to the lessee a right to demolish the building altogether, without any further compensation.

■ While taxpayers strenuously urge to the contrary, it was permissible for the trial judge to infer from the proofs that taxpayers themselves, in failing to take any steps to avert the demolition of the building, at least in part, tacitly acknowledged that it had little value apart from the land.

---

capable of producing enough net income that a return or market rent on the value of the land has to be deducted first, and then any income that remains is attributable to or computable to the building, and by taking this figure and capitalizing it at a rate, it gives an indication of building value, so the next step here was to subtract from this net income a return, and I used the rate of 6 percent as being a minimum return that one would expect on their investment at this time at the date of valuation, so I deducted from this 6 percent interest or income return on the land value of $161,000, which I had estimated based on the market data. "We see if we multiply the $161,000 by 6 percent, and as representing the interest or economic rent return on the value of the land as though vacant, would require an income of $9,690."

Having demonstrated earlier in his testimony that the land with the building on it was capable of producing $8,800 in income, Mr. Curry concluded:

" . . . as so improved, the building has no market value at all; but, rather, it has become a detriment to the land, and really it should have been torn down, because it is incapable of producing net income imputable to improvements; in fact, there is some $890 short because the building is there."

Although, as we noted earlier, taxpayers' proof that the building was rented at the date of death was their most convincing evidence of its value, we do not believe it sufficient to render clearly erroneous the trial judge's finding of no fair market value. Indeed, a close examination of the record and the trial judge's expressed reasons for his findings, reveal sound reasons for disregarding this evidence as controlling proof of value.

■ It is undisputed that, even with the building, the property had value and was capable of use. We do not believe that it necessarily follows, however, as urged by appellants, that for this reason a failure to ascribe any market value to the building itself was error. Upon reviewing the condition of the building and concluding that rehabilitation costs were prohibitive, the judge concluded that "It could not be said that it really had a useful life left as a retail commercial structure in 1959." He further concluded that the bank itself, in leasing the property, "regarded the building as having no economic value", and that the decision of the Fashion Bar to locate in the building and later to seek unsuccessfully a lease in its own right, was in recognition of the prime location which was offered, not of the value of the building itself, and reflected its willingness to take a gamble that it might acquire that location for its own later use.

■■ Moreover, we find no merit in the contention of the taxpayers that the trial court gave no weight to certain evidence offered by them and received by the court.[7] Appellants do not assert that any evidence which they offered was erroneously excluded from presentation or consideration. It is the function of the trial court alone to weigh evidence and assess credibility of witnesses. As taxpayers themselves argue, even the testimony of an expert witness may be disregarded if it conflicts with the sound judgment of the trial court based on his evaluation of all the evidence. Estate of Kreis v. C. I. R., *supra*. The reviewing court is not to substitute its judgment on the probative value of specific evidence, but is to look to the entire evidence on the record. Unless, on that basis, it is "left with a definite and firm conviction that a mistake has been committed", it must affirm the findings of the trial court. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218 (1960).

■ We conclude, therefore, upon a careful review of the entire record, that the finding of the district court that the building had no fair market value on the dates in question, and hence that appellants had no basis in the building, is supported by the competent evidence, and is not clearly erroneous. F.R.Civ.P. 52. We decline to hold that, as a matter of law, a building must have a separate fair market value as that term is defined in United States v. Miller, *supra*, whenever it has a rental value, however temporary.

■ Finally, we conclude that the district court was correct in declining to consider whether, because of a demolition clause in the lease, taxpayers would have been precluded by Section 1.165–3(b)(2) of the Treasury Regulations to the Internal Revenue Code from taking a demolition loss deduction under Section 165 of the Code.[8] The lease granted the

7. Appellants assert that the trial court accorded "no weight" to: the testimony of either taxpayer; the testimony of the official from the county assessor's office; the evidence regarding fire insurance; evidence of rental use; and the evidence of value as determined by the Colorado Department of Revenue.

8. United States Treasury Regulation § 1.-165–3(b)(2) provides:

If a lessor or lessee of real property demolishes the buildings situated thereon pursuant to the requirements of a lease or the requirements of an agreement which resulted in a lease, no deduction shall be allowed to the lessor under Section 165(a) on account of the demolition of the old buildings.

   \*    \*    \*    \*    \*    \*

Whether this language prohibits a demolition loss deduction where demolition is not ac-

lessee an option to demolish the building, but did not mandate it. Since the trial court found as a matter of fact that the building had no fair market value and hence no separate adjusted basis, a finding which we hold to be not clearly erroneous, it treated the issue as moot. We agree. Even under the construction of the law urged by taxpayers,[9] there would be no loss to deduct since the adjusted basis of the building was found to be zero. "A court is not empowered to 'declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it'." Caldwell v. Craighead, 432 F.2d 213, 218 (6th Cir. 1970).

Accordingly, the judgment of the district court is affirmed. Costs to appellee.

tually mandatory, but is nevertheless permitted by the lessee during the term of the lease, has produced a split in the circuits. The Seventh Circuit in Landerman v. Commissioner of Internal Revenue, 454 F.2d 338 (1971), and the Eighth Circuit in Foltz v. United States, 458 F.2d 600 (1972), have taken the position that an option in the lessee to demolish the lessor's building, precludes the taking of the deduction. The Ninth Circuit in Feldman v. Wood, 335 F.2d 264 (1964), and the Fifth Circuit in Hightower v. United States, 463 F.2d 182 (1972),

take a more restrictive view of the regulatory language, holding that the lessor may take the demolition loss where demolition by the lessee is permitted but is not mandatory under the terms of the lease. As the issue is not properly before us, we can not take a position at this time as to the proper construction of the regulation. We note, however, that the pertinent regulation is currently under study for possible amendment.

9. See *Feldman, supra,* and *Hightower, supra.*