TOM E. BUTZ and MARY E. BUTZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Butz v. Commissioner
Docket No. 2098-74.
United States Tax Court
T.C. Memo 1976-118; 1976 Tax Ct. Memo LEXIS 285; 35 T.C.M. (CCH) 532; T.C.M. (RIA) 760118; April 19, 1976, Filed Joshua J. Kancelbaum, for the petitioners. Jack E. Prestrud, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in Federal income tax of petitioners Tom E. and Mary E. Butz for the calendar years 1969 and 1970 in the amounts of $9,473.16 and $293.51, respectively. Some of the issues have been disposed of by agreement of the parties leaving for our decision the following: (1) Whether petitioners are entitled to a deduction under section 165, I.R.C. 1954, [1] for the calendar year 1969 for a loss from the demolition of buildings upon a parcel of land acquired by a joint venture in which petitioner Tom E. Butz was a participant and, if so, the amount thereof; (2) whether petitioners are entitled to a business expense deduction under section 162 for each of the calendar years 1969 and 1970 for the payment of country club dues; and (3) whether petitioners are entitled to a business expense deduction under section 162 for each of the calendar years 1969 and 1970 for the payment of the expenses of maintaining the grounds around their *288 personal residence in which petitioner Tom E. Butz had an office. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Tom E. and Mary E. Butz, husband and wife, who at the time of the filing of their petition in this case were residents of Chagrin Falls, Ohio, filed a joint Federal income tax return on the cash method of accounting for each of the calendar years 1969 and 1970 with the District Director of Internal Revenue, Cleveland, Ohio. During 1969, Tom E. Butz (Mr. Butz) became a participant in a joint venture with his son David Butz, Aqua Systems, Inc., George Langenmeier, W. Stewart Buchanan and Virginia Nemyo. David Butz was the president of Aqua Systems, Inc. The joint venture intended to purchase land in North Olmsted, Ohio and to have David Butz, who had obtained the local franchise rights from a national company to operate a car wash, construct a building thereon suitable for a car wash. The land and building were to be leased to a corporation which was to be organized and in which each joint venturer was to possess an interest in the same approximate *289 proportion as his interest in the joint venture. David Butz was to permit his franchise rights to be used by the venture. Initially, Aqua Systems, Inc. was to manage the operation of the car wash. On March 1, 1970, the management of the car wash was to be turned over to the newly formed corporation of which Thomas Nemyo, the husband of Virginia Nemyo, was to be president. Sometime prior to April 1969, Thomas Nemyo sought a site in North Olmsted which would be suitable for a car wash facility. He found some vacant land on Lorain Avenue suitable for the venturers' intended purpose of constructing and operating an automatic car wash. He approached the owner of this land, Mrs. Kiehl, to see if she were interested in selling it. Mrs. Kiehl owned two contiguous lots on Lorain Avenue, both of which were zoned commercial. One of the lots (the western parcel) had a front footage on Lorain Avenue of 115.15 feet and an average depth of 431.14 feet and improvements thereon which included a residence, a separate garage, a greenhouse to which a shed was attached, and a shop building of approximately 1,500 square feet. The residence was a two-story, three bedroom, frame house with a full basement. *290 The other lot (the eastern parcel), which was vacant land, had a front footage on Lorain Avenue of 104.79 feet and an average depth of 469.41 feet. Mrs. Kiehl wanted to sell both of the lots and had them listed for sale with a real estate agency. However, she was uninterested in selling the eastern parcel or a portion thereof separate from the western parcel. Insomuch as Mrs. Kehl was not interested in selling only the eastern parcel or a portion thereof, Thomas Nemyo did not pursue the matter further. However, he did show the vacant lot to David Butz who then contacted Mrs. Kiehl's real estate agent. Until April 1969, the residence on the western parcel was rented for $125 monthly. Mrs. Kiehl initially wanted $191,000 for both parcels but later she reduced her asking price to $185,000. The joint venture made an oral offer to Mrs. Kiehl's agent to buy the eastern 90 feet of the eastern parcel on Lorain Avenue. Because she was unwilling to sell any less than the total land in both parcels, Mrs. Kiehl rejected the offer. The members of the venture decided that in order to obtain the desired 90 feet of the eastern parcel they would have to purchase both parcels. The venture *291 had been assured by Mrs. Kiehl's agent that the excess land, the western parcel and a portion of the eastern parcel, could be resold immediately after the purchase of the two parcels. Mr. Butz and David Butz on behalf of the venture made a written offer to purchase both parcels of land for $159,300 contingent upon their obtaining within 90 days permission from the local zoning board for construction of a proposed structure and a loan in the amount of $111,300 at an interest rate of 8 percent per annum. The offer further provided that unless the purchaser elected to secure new insurance, prepaid premiums on all insurance policies deposited in escrow should be prorated in escrow as of the date of filing the deed for record. Further, the offer provided that if the buildings were damaged or destroyed prior to the filing of the deed of record, the purchasers had the option to receive the proceeds of any insurance or to rescind the agreement and recover all funds theretofore paid. At the time of the written offer, Mrs. Kiehl was considering the possibility of moving the house and garage from the western parcel to a nearby residential lot.She obtained an estimate from a commercial *292 mover of the cost of relocating the house and garage. Mrs. Kiehl agreed to the terms of the venturers' offer on the condition that it be amended to grant her the option to remove from the premises any structures and a specified pile of top soil within 90 days after acceptance of the offer or 30 days after transfer of title. Mrs. Kiehl limited her right to remove the structures to a specified period at the suggestion of her agent who advised her that an unrestricted right of removal might not be acceptable to the venturers. The contract of purchase and sale incorporating the terms of the offer as revised was executed on April 12, 1969. The agent advised the venturers that in his view it was improbable that Mrs. Kiehl would move the structures as she would not wish to incur the cost or removal while the sale remained contingent and would be unable to remove the structures from the property onto land she would have to buy within the time required after title was transferred. Mrs. Kiehl did remove the garage within the agreed upon time period. Following the execution of the contract, the venturers entered into an agreement with the real estate agency with which Mrs. Kiehl's agent *293 was associated that provided for the agency's listing the excess land consisting of the western parcel and all the eastern parcel except the eastern 90 feet fronting on Lorain Avenue for sale for $130,000 which was approximately $1,000 per front foot. Mrs. Kiehl's agent then became the agent of the venturers. The agent erected a billboard on the excess land, placed advertisements in the newspapers and sent letters to potential commercial buyers, advertising the excess land for sale as commercial property. Prospective purchasers were advised that the venturers had entered into an executory contract and that the buildings were subject to removal by Mrs. Kiehl. Although the structures on the western parcel would generally have had only an interim use to a commercial buyer, some doctors indicated an interest in buying the excess land from the venture and converting the house into a clinic. The venture received an offer to lease the shop building in the event that it remained on the property. The venture did not consider the proposal to lease as it was interested only in the sale of the excess land. In the summer of 1969, a national restaurant chain expressed an interest in the venture's *294 constructing a restaurant building on the excess land and then leasing it to them. The venture rejected the offer as it was interested in divesting itself of the excess land so that its indebtedness would be reduced and its capital increased. The agent advised the venture to accept the leasing arrangement and to raze the existing structures so that a commercial lessee would find the excess land more suitable for commercial purposes and immediately available for construction of a commercial building. The venturers took title to the property by a warranty deed dated July 28, 1969, in proportion to their interests in the venture which were as follows: Petitioner Tom Butz, 51.9 percent; David Butz, 14.8 percent; Virginia Nemyo, 14.8 percent; George O. Langenmeier, 7.4 percent; Aqua Systems, Inc., 7.4 percent; and W. Stewart Buchanan, 3.7 percent. Sometime before the property was conveyed, Mrs. Kiehl canceled the policies that insured the buildings. After the filing of the deed, the buildings remaining on the excess land were not insured although the venturers at that time thought that the policies had been transferred from Mrs. Kiehl to them by the escrow agent. By late August *295 1969, financing was becoming more difficult and costly to obtain and the venture had been unable to sell the excess land. The agent again advised the venturers that they should consider a leasing arrangement whereby they would have a building constructed to suit a particular commercial tenant who would then lease it from the venture on a longterm basis. To be in a position to build immediately, the agent advised the venture to demolish the buildings on the excess land. The bank released the mortgage against the excess parcel so that the venturers' equity in that property could be used to obtain financing for the cost of the construction of a building. In September 1969, the venturers met to decide whether they should continue their efforts to sell the property or enter a leasing arrangement. At Thomas Nemyo's suggestion, the venturers decided that he should seek a buyer to purchase the buildings on the excess parcel who would then move them to another location. During September and October 1969, three different parties expressed an interest in acquiring the buildings and relocating them but none of them were able to obtain financing to buy the buildings and a nearby residential *296 lot. In late October, the venturers decided to demolish the buildings and, in the event they did not sell the excess land in the meantime, to enter into a leasing arrangement on a building that they might build for a commercial tenant. On November 19, 1969, the residence and shop building were demolished at a cost of $850. At that time the venture had not contracted to lease the excess land. On December 2, 1969, the venture entered into an executory contract to lease the excess property and a building they were to construct thereon. However, subsequent zoning restrictions prohibited the venture from obtaining a building permit to construct the building it was to lease and consequently the leasing arrangement could not be carried out. On December 16, 1969, the car wash building was completed. On January 2, 1970, David Butz and his wife conveyed a 1.5 percent undivided interest in both parcels of the property to W. Stewart Buchanan. The local tax authorities for the county in which both parcels of land were located appraised land by utilizing comparable sales and improvements based on replacement cost less depreciation. The replacement cost was based on local costs for *297 building materials and labor in 1956. Depreciation was based on the physical deterioration of a structure which was related to its age and its condition. Prior to 1965 the county auditor's office appraised Mrs. Kiehl's property.This appraisal was used for determining assessments from 1964 through 1968 and, after having been adjusted, for 1969. In 1970 the county auditor's office reappraised both parcels which were then owned by the venturers and this appraisal was used for making assessments for 1970. The amounts of assessment for the western parcel for 1969 were $7,870 for the improvements and $17,430 for the land. The amount assessed for the western parcel land for 1970 was $20,780. The amount of the assessment for the eastern parcel land was $16,160 for 1969 and $21,160 for 1970. The amount assessed for 1969 was 85 percent of the appraised value of the land and buildings. On September 28, 1961, the county auditor's office judged the machine shop to be in fair condition and appraised its value to be $3,361. This amount represented the replacement cost of $5,171 computed on the basis of $3.40 per square foot and 1,521 square feet less depreciation of 35 percent. The *298 machine shop had originally been built about 1920 and remodeled in 1939. For the 1964 assessment the residence, garage, greenhouse and the shed attached to the greenhouse were appraised at a total value of $5,897. The residence (approximately 1,300 sq. ft.) was appraised for $5,276 based on a replacement cost of $9,096 less depreciation of 42 percent. The home was built in 1929. The garage (360 sq. ft.) was appraised for $345 based on a replacement cost of $460 less depreciation of 40 percent. The greenhouse (188 sq. ft.) was appraised for $108 based on a replacement cost of $269 less depreciation of 60 percent. The underlying land of the western parcel was appraised at a value of $20,510 and the eastern parcel at a value of $19,010 for the 1969 assessment. On the basis of comparing the amounts of sales prices to assessments for 1969 for the county in which the parcels were situated, the Ohio Board of Tax Appeals determined an overall ratio of the amount of assessments to the fair market value of the property. The ratio of the amount assessed to fair market value was 32.8 to 100 for 1969 and 33.4 to 100 for 1970. Using this ratio for 1969, the fair market value of the structures *299 on the western parcel was $23,993 of which the garage, greenhouse and shed represented $1,570 and the fair market values of the underlying land of the western and eastern parcels were the amounts of $53,140 and $49,268.Using the ratio for 1970, the fair market values of the underlying land of the western and eastern parcels were $62,215 and $63,356, respectively. In 1947, Mr. Butz was employed by an accounting firm and at their urging he became a member of a country club. In 1948, he left the firm and became an officer and director of a Cleveland manufacturing company which paid his dues so that he would retain his membership at the club. On January 31, 1969, he retired from this company and began a financial consulting business. He maintained his membership in the club so that in the event he needed it for business purposes it would be available. He and his wife used the club facilities during approximately 6 or 7 days in 1969 and 8 or 9 days in 1970. On several of these occasions in each of these years, he entertained his clients at the club. At other times he and his wife patronized the club facilities to comply with the rules of the club. In 1969 and 1970, petitioners Tom *300 and Mary Butz paid the country club the amounts of $677 and $1,031, respectively. In 1974, Tom Butz resigned his membership in the club. During 1969 and 1970, Mr. Butz was a financial consultant to a Detroit company and to Curtis Noll Corporation. For his work for Curtis Noll, he was paid on a salary basis. During 1970 he also was the accountant for several car wash businesses. He used the library in his home in Chagrin Falls, Ohio as an office. During 1969 and 1970, Mr. Butz would usually consult with the representatives of the Detroit company in Detroit but on two or three occasions these representatives came to his office at his home. In 1970 two or three conferences were held in his office regarding his work for various car wash operations. The representatives of Curtis Noll Corporation did not come to Mr. Butz' office during 1969 or 1970. Mr. Butz paid the amounts of $3,803.20 and $2,248.48 during 1969 and 1970, respectively, for the upkeep and maintenance of the grounds surrounding his home. For the calendar year 1969, petitioners Tom and Mary Butz reported income of $45,263.14 as wages of which $9,923.14 was shown by the Form W-2 attached to their return as attributable *301 to Tom Butz' salary from Curtis Noll. They reported miscellaneous income of $3,400 from the Detroit company for sales consulting. On their return they deducted the amount of $13,416.15 as a demolition loss. This amount was their proportionate share (51.9 percent) of the amount of $25,850, which was their estimated value of the building on the property when it was purchased plus the cost of the demolition. The following explanation was noted on the return: When property was purchased, it was intended to resell that part that had buildings on it, but later we had to change our mind. On their joint return for 1970, petitioners reported wages of $12,000 from Curtis Noll Corporation and $900 from North Olmsted Corporation which was operating the car wash, as shown from the W-2 Forms attached to their return. They also reported miscellaneous income of $6,462.50 for Mr. Butz' services as a sales consultant of the Detroit company. On their returns for 1969 and 1970 they deducted as miscellaneous business expenses the amounts of $677 and $1,031, respectively, for country club dues.They deducted $1,168.06 and $1,054.79 for 1969 and 1970, respectively, for "Office expense-1/8 of home *302 - Depreciation 1/8 of home." The amounts of $475.40 and $278.56 for the years 1969 and 1970, respectively, of the claimed "home office expenses" represented 1/8 of the amount paid by Mr. and Mrs. Butz in each of these years for lawn maintenance. Respondent in his notice of deficiency increased petitioners' reported income for 1969 by the amount of the claimed demolition loss of $13,416.15. Respondent explained that the demolition loss was not allowable because it had not been established that the loss qualified as a deduction within the meaning of section 165. Respondent disallowed the deduction claimed by petitioners in each of the years 1969 and 1970 for country club dues and also disallowed the part of the deductions claimed by them in each year as "home office expense" which was for lawn maintenance. Respondent stated as his basis for the disallowance of these claimed deductions that the dues paid to the country club had not been shown to be ordinary and necessary business expense and that the cost of lawn maintenance was a nondeductible personal living expense under section 262. OPINION Petitioners contend that they are entitled to a deduction under section 165 for *303 the calendar year 1969 for their share of the loss sustained by the venture in which Mr. Butz was a participant upon the demolition of the buildings situated on the western parcel of land that the venturers had purchased. They argue that the total loss of the venture from the destruction of the buildings was $37,819. This amount represented the $850 that the venture paid to have the buildings destroyed plus the amount of $36,969 which petitioners contend the venture paid for the purchase of the buildings. [2] Petitioners argue that Mrs. Kiehl's right to remove the structures did not reduce that portion of the purchase price allocable to the buildings. They contend that because of the contingent nature of the sale between the time of the execution of the contract of purchase and sale and the time title was transferred and the limited period allowed for the exercise of the right to remove the structures after the transfer of title, the possibility of the removal of the buildings was too remote to affect the allocation of the purchase price between land and buildings. *304 Respondent contends that petitioners had no basis in the buildings demolished since the contract for the purchase of the property granted to the seller the right to remove the buildings and therefore any demolition loss to which petitioners might be entitled would be the $850 cost of demolishing the buildings. However, respondent contends that petitioners are not entitled to any deduction under section 165 for a demolition loss since the venturers had the intent to demolish the buildings before they acquired title to the land and therefore the entire purchase price and the $850 cost of demolition was properly considered as cost of the land. Section 165(a) allows a deduction for any loss sustained during a taxable year which is not compensated for by insurance or otherwise. Under section 165(b) the amount of the deduction for any loss is the adjusted basis of the property under section 1011. See section 1.165-1(c), Income Tax Regs. No deduction is allowed for the cost of buildings which are demolished when the property on which the buildings are situated is *305 purchased with the intent of demolishing the buildings. Section 1.165-3(a)(1), Income Tax Regs.[3] However, a deduction is allowed if the demolition occurs as a result of a plan formed subsequent to the acquisition of the buildings that were demolished. Section 1.165-3(b)(1), Income Tax Regs.[4] Since, if the venturers did not have the intent of demolishing the buildings when the land was purchased petitioners would be entitled to deduct their pro rata share of the $850 cost of destroying the buildings even if they had no basis in the buildings themselves, we will first consider this question. *306 Whether the venturers purchased or acquired the property with the intention of demolishing the buildings is a factual issue. The determination of this issue is to be made from a consideration of all the facts and circumstances existing in the case. Section 1.165-3(c)(1), Income Tax Regs. Paragraphs (2) and (3) of section 1.165-3(c) of respondent's regulations list several factors that may suggest an intent to demolish. [5]
*307 Respondent argues that the pertinent date for determining the requisite intent to demolish is the time the title passed or the benefits and burdens of ownership were transferred to the buyer which he contends in this case was on July 28, 1969. Petitioners argue that the critical date for determining intent or lack thereof is the date of the execution of the contract for purchase and sale on April 12, 1969. The date of purchase of property for purposes of determining whether an intent to demolish a building on that property existed at the date of purchase has been held to be the date of the execution of the contract of purchase and sale. First Natl. Bank & Trust Co. of Chickasha v. United States,462 F. 2d 908 (10th Cir. 1972). [6] The fact that under the contract of purchase and sale in this case executed on April 12, 1969, the seller had the right to remove the buildings, in our view is not tantamount to an intent of the purchaser to demolish the buildings. Under these facts the intent to demolish would of course have to be an intent to demolish if the seller did not *308 exercise her right to remove the buildings. Under the facts and circumstances of this case, we conclude that at the time the purchase and sale contract was entered into the venturers did not intend to demolish the buildings if the buildings were not removed but intended to sell the land on which the buildings were then situated with the buildings thereon. In fact, in this case it is immaterial whether the purchase date is the April 12, 1969, contract date or the July 28, 1969, conveyance date since the evidence is clear that the intent of the venturers to demolish the buildings was not formed until their efforts to resell the land and buildings had proved unsuccessful and alternatives to the sale of the land were considered. The time that intent to demolish was formed was not earlier than September 1969. Therefore, we hold that petitioners as participants in the venture are entitled to a deduction for their share of the demolition cost and the adjusted basis, if any, of the *309 buildings. [7]
Mr. Butz and Mr. Nemyo both testified that the venturers did not intend to demolish the buildings but to sell the land with the buildings at the time the seller's right to remove expired and the venturers unconditionally acquired the buildings. Respondent asserts that the short period of time between acquisition and demolition, the unsuitability of the buildings for the venturers' business purposes of operating a car wash, the extensive cost of remodeling the buildings to convert them to their best economic use, and the inadequate monetary return from the buildings inferred that the venturers had an intent to demolish the buildings at the time of their acquisition. We have considered these arguments *310 in light of the facts in this record. The facts show that the venturers made every effort to sell the land and buildings until September 1969 and then they endeavored to sell the buildings by themselves. It was only when their expectations of selling either the land with the buildings thereon or the buildings themselves were unfulfilled that they decided to enter into a leasing arrangement and in preparation for that eventuality to demolish the buildings.Their inability to sell the land with the improvements or the improvements by themselves was partially the result of prospective purchasers being unable to obtain financing due to the unforeseen reduction in the amount of credit available after the venturers' acquisition of the buildings. We conclude that the venturers did not have an intent to demolish the buildings upon their acquisition, but that such intent was subsequently formed. The much more difficult question to determine from the facts in this record is the amount, if any, of the venturers' basis in the buildings under section 1011. [8] Respondent contends that no portion of the consideration paid by the venturers for the acquired property was allocable to the structures *311 located thereon. He argues that the venturers did not pay anything for the structures insomuch as the buildings had no inherent value and, even if they had, Mrs. Kiehl had the right to remove the structures without any adjustment of the purchase price. Petitioners contend that at least the amount of $25,000 of the purchase price was allocable to the buildings based on county real estate assessments and appraisals connected therewith for the year 1969 and the seller's reduction of the asking price of the property upon her being granted the right of removal. Petitioners argue that the seller's option of removing the buildings did not affect the amount allocated to the buildings because in their judgment at the time of acquisition Mrs. Kiehl would not incur the cost of removal of the structures while the contract was still executory and would not have sufficient time to remove the buildings after settlement. *312 The local county tax assessments for 1969 of both parcels of land with improvements and of the improvements themselves were in the amounts of $41,460 and $7,870, respectively. Based on the ratio of the county assessment valuations for 1969 of the buildings to the land with improvements which this Court has sometimes recognized in determining relative values between buildings and land, 2554-58 Creston Corp.,40 T.C. 932, 939-940 (1963), the amount of the purchase price that would be allocable to the buildings was approximately $31,083. Based on the ratio of the appraised valuations which was used in determining the assessed valuations for 1969, the amounts of the purchase price which would be allocable to the buildings was approximately $29,259. From the facts in this record we conclude that the amounts determined as allocable to the buildings on the basis of these assessments for 1969 and appraisals in connection therewith are not a reliable indication of the relative fair market value of the land and buildings. They are determined on appraisals made as early as 8 years prior to the year of purchase and then on the basis of 1956 replacement costs of materials and labor less *313 physical deterioration. Even if we were to assume that the adjustments made to determine the 1969 assessments were an accurate reflection of the further physical depreciation of the buildings since the appraisals made in connection with the 1964 assessments, there still remains the incurable defect of failure of the resultant figure to reflect the economic depreciation because of the changed circumstance with respect to best use of the land. It is clear that in 1969 the property's best use was as commercial property and that the buildings at best would have only an interim use before the property was converted to commercial use. Consequently any allocation of the purchase price to the buildings based on their replacement value less depreciation is not a reasonable reflection of an allocation of the price paid for the property between land and buildings. Under the facts here shown replacement value of the buildings has no relationship to their economic value. Based on a ratio determined by the Ohio Board of Tax Appeals of assessments to fair market value for 1969, the amount of the purchase price which would be allocable to the buildings was approximately $32,000. However there *314 is insufficient basis in this record to permit us to ascertain how this ratio was established in order to determine the reasonableness of an allocation of the purchase price of the land and buildings based thereon. Furthermore, the basis of the venturers in the buildings is the cost of the buildings to them. Whenever any form of allocation is used for prorating the total purchase price of a property between land and buildings to determine a taxpayer's basis in each, the underlying assumption is that such an allocation is an appropriate method of determining the cost of each to the taxpayer. In the instant case we are not warranted in making any such assumption, since the seller retained the right of removal of the buildings and therefore the venturers paid only for a contingent right to the buildings and an absolute right to the land. In our view the shop building and residence did have some intrinsic worth when they were acquired by the venturers and the venturers paid some portion of the purchase price for the right to acquire this intrinsic value if Mrs. Kiehl did not exercise her right of removal. The fact that the residence and shop had some intrinsic value is indicated *315 by the seller's interest in removing the buildings to another lot and certain prospective buyers' interest in buying the residence and moving it to a new location. Apparently the expenses of moving the house were less than the value of the house relocated, or neither Mrs. Kiehl nor other interested parties would have contemplated moving the house. Also, certain prospective buyers, doctors, contemplated buying the property and converting the residence into a clinic building. The house had been rented and the shop building could have been rented. The rental for the house was $125 per month. The amount offered for rental of the shop does not show in the record. However, if we were to approximate a capitalized value of the residence and shop and the land on which they stood of $15,000 from their income-producing capacity, we would still not conclude that the buildings had an economic value of some pro rata portion of this $15,000. We are confronted with the fact that the amount of rental from the buildings would probably be insufficient to result in any reasonable return on the value of the land. See Barry v. United States,501 F. 2d 578 (6th Cir. 1974). *316 In our view the venturers in making the offer to purchase the property for $159,300 placed some value on the buildings and even when they accepted the counter offer of Mrs. Kiehl to sell them the property for the $159,300 with a reservation that she be permitted within a limited time to remove the buildings placed some value on the buildings, since the agent had assured them it was unlikely the buildings would be removed. However, in our view the value the venturers placed on the buildings, or their contingent right to acquire the buildings, was not in excess of the value the buildings would have when sold to be removed from the property or the value they would have for interim use by a prospective purchaser who would buy the land for permanent commercial use.This value would be substantially less than the capitalized value of the property as rental property because of the interim nature of the use of the buildings if they remained on the property and the cost of removal of the buildings and a lot to put them on if they were removed. Considering all the evidence in the record, including (1) the amount for which the residence was rented, (2) the replacement value less depreciation *317 of the buildings as determined for tax assessment purposes, (3) the fact that there had been substantial increases in building costs between the date the replacement costs were determined and 1969, (4) the fact that the venturers at the time the contract was entered into and when title to the property was taken had left an option in the contract for the seller to remove the buildings within 30 days after title passed, and (5) the fact that the property was zoned commercial at the time the contract of sale was entered into and its highest and best use was commercial, we conclude that $7,500 of the $159,300 purchase price of the property by the venturers is properly allocable to the buildings on the property that were demolished. We therefore hold that petitioners are entitled to a demolition loss of 51.9 percent of $8,350 ($7,500 plus the $850 cost of demolition). Section 162 generally allows a deduction for all the ordinary and necessary expenses paid during the taxable year in carrying on a trade or business. Section 274(a)[9] generally provides that no deduction is allowed for any expenditure *318 relating to an entertainment facility, including dues to any social or athletic club, unless the taxpayer establishes that the facility was used primarily for business purposes and that the expenditure was directly related to the active conduct of such business. Section 274(a) further provides that the amount of any deduction is limited to that portion of the expenditure that is directly related to the active conduct of the taxpayer's business; see section 1.274-2(a)(2), Income Tax Regs.; William K. Coors,60 T.C. 368, 407 (1973), affd. 519 F. 2d 1280 (10th Cir. 1975). Section 274(d)[10] generally provides that no deduction is allowed for an expenditure with respect to an entertainment facility unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement the amount of such expense, the time and place of the use of the club, the business purpose of the expense and the business relationship to the taxpayer of persons using the club. See William F. Sanford,50 T.C. 823 (1968), affd. per curiam 412 F. 2d 201 (2d Cir. 1969), cert. denied 396 U.S. 841 (1969). *319 Petitioners contend that they are entitled to a business expense deduction for dues paid to the country club. Respondent contends that petitioners are not entitled to any deduction for the club dues since petitioners have failed to substantiate the deductibility of the dues under section 274. *320 Petitioners have the burden to prove that the club was used primarily for the furtherance of Mr. Butz' business and that the payment of the club dues was directly related to the active conduct of his business. See section 1.274-2(e)(4)(i), Income Tax Regs.[11] It is the actual use of a country club rather than its availability for use or the member's principal purpose for joining that is determinative of primary use under section 1.274-2(e)(4)(i), Income Tax Regs.Under the facts here shown Mr. Butz did not primarily use the club in furtherance of his business. The facts presented show that petitioners' use of the club for personal reasons exceeded Mr. Butz' use of the club for business purposes. Both the number of days of business and personal use and the amounts expended for personal and business purposes indicated that the personal use of the club exceeded its business use. Petitioners have failed to properly substantiate business use by either adequate records or other corroborative evidence sufficient to support Mr. Butz' statement *321 as to the use of the club as required by section 274(d). See section 1.274-5, Income Tax Regs. Petitioners have presented no evidence as to use other than Mr. Butz' oral testimony, and his testimony is imprecise. Since petitioners have failed to satisfy the primary use requirements of section 274(a) and have not substantiated the business use of the club in accordance with section 274(d), we conclude that they are not entitled to deduct any amount for club dues for the years 1969 and 1970. *322 Petitioners have the burden to show that the expenditures for lawn maintenance around their home in which Mr. Butz' office was located were ordinary and necessary expenses that were proximately related to Mr. Butz' business. Respondent has not disallowed any expense reported by petitioners as attributable to the home office other than lawn care. On this record, we conclude that petitioners have failed to show that the expenses for maintaining the lawn were proximately related to the maintenance of Mr. Butz' office rather than the personal, living and family expenses for which section 262 provides that no deduction shall be allowed. Petitioners' reliance on certain Memorandum Opinions of this Court is misplaced. In all those cases we concluded that the taxpayer incurred expenses for the maintenance of the lawn because the lawn care was directly related to his home business office. Here, it was rare for a client or business associate to come to Mr. Butz' home office. There was no separate entrance to the office with a surrounding lawn. The office was a place where Mr. Butz worked and its use was not comparable to the use made of a home office by a lawyer who practices solely *323 or primarily from his home or a doctor who sees patients regularly at his home. In those cases a place for clients or patients to park their cars must be maintained. Here, Mr. Butz' lawn in no way added to his use of a room in his home as an office in which to work. Under the facts here we conclude that no portion of the expense of maintaining the grounds surrounding the home office was properly attributable to Mr. Butz' expense of maintaining his office but that the total lawn expense was properly attributable to maintaining his home as a personal residence. We hold that petitioners are not entitled to any business expense deduction for lawn maintenance for 1969 and 1970. Decision will be entered under Rule 155.
Footnotes
1. All references are to the Internal Revenue Code of 1954, as amended.↩
2. The petitioners compute the $36,969 as follows: ↩
Purchase price of land and building
$159,300
Assessed value of buildings ($7,780)
X sales/assessment ratio
(1000/328) =
23,994
Increase in replacement cost since
1956 based on consumer price index
9,069
33,063
Decrease by physical depreciation since
1964 based on rate of 2% per year
3,306
Value of Buildings
29,757
Assessed value of land and buildings
($41,160) X sales/assessment
ratio (1000/328) =
Value of land and building (approx.)
124,380
Value of Bldg. Value of Land & Bldg. (29,757) / (124,380) X (159,300) = Purchase Price of Land & Bldg.
Amount of purchase price allocable
to the buildings
38,073
Appraised value of garage (345) X
percentage assessed (85%) = Assessed
value (293) X sales/assessment ratio
(1000/328) = Value of Garage (890)
Value of Garage Value of Buildings (890) / 29,757 X (38,072.70) = Purchase price allocable to buildings
Purchase price allocable to the garage
1,104
Purchase price allocable to buildings
except for garage
$ 36,969
3. Sec. 1.165-3(a)(1) [Income Tax Regs.] provides that: Sec. 1.165-3 Demolition of buildings. (a) Intent to demolish formed at time of purchase. (1) Except as provided in subparagraph (2) of this paragraph, the following rule shall apply when, in the course of a trade or business or in a transaction entered into for profit, real property is purchased with the intention of demolishing either immediately or subsequently the buildings situated thereon: No deduction shall be allowed under section 165(a)↩ on account of the demolition of the old buildings even though any demolition originally planned is subsequently deferred or abandoned. The entire basis of the property so purchased shall, notwithstanding the provisions of § 1.167(a)-5, be allocated to the land only. Such basis shall be increased by the net cost of demolition or decreased by the net proceeds from demolition. 4. Sec. 1.165-3(b)(1) [Income Tax Regs.] provides that: (b) Intent to demolish formed subsequent to the time of acquisition. (1) Except as provided in subparagraph (2) of this paragraph, the loss incurred in a trade or business or in a transaction entered into for profit and arising from a demolition of old buildings shall be allowed as a deduction under section 165(a) if the demolition occurs as a result of a plan formed subsequent to the acquisition of the buildings demolished.The amount of the loss shall be the adjusted basis of the buildings demolished increased by the net cost of demolition or decreased by the net proceeds from demolition. See paragraph (c) of $1.165-1 relating to amount deductible under section 165↩. The basis of any building acquired in replacement of the old buildings shall not include any part of the basis of the property demolished.
5. Sec. 1.165-3(c) [Income Tax Regs.] provides as follows: (c) Evidence of intention. (1) Whether real property has been purchased with the intention of demolishing the buildings thereon or whether the demolition of the buildings occurs as a result of a plan formed subsequent to their acquisition is a question of fact, and the answer depends upon an examination of all the surrounding facts and circumstances. The answer to the question does not depend solely upon the statements of the taxpayer at the time he acquired the property or demolished the buildings, but such statements, if made, are relevant and will be considered. Certain other relevant facts and circumstances that exist in some cases and the inferences that might reasonably be drawn from them are described in subparagraphs (2) and (3) of this paragraph. The question as to the taxpayer's intention is not answered by any inference that is drawn from any one fact or circumstance but can be answered only by a consideration of all relevant facts and circumstances and the reasonable inferences to be drawn therefrom.
(2) An intention at the time of acquisition to demolish may be suggested by: (i) A short delay between the date of acquisition and the date of demolition; (ii) Evidence of prohibitive remodeling costs determined at the time of acquisition; (iii) Existence of municipal regulations at the time of acquisition which would prohibit the continued use of the buildings for profit purposes; (iv) Unsuitability of the buildings for the taxpayer's trade or business at the time of acquisition; or (v) Inability at the time of acquisition to realize a reasonable income from the buildings. (3) The fact that the demolition occurred pursuant to a plan formed subsequent to the acquisition of the property may be suggested by: (i) Substantial improvement of the buildings immediately after their acquisition; (ii) Prolonged use of the buildings for business purposes after their acquisition; (iii) Suitability of the buildings for investment purposes at the time of acquisition; (iv) Substantial change in economic or business conditions after the date of acquisition; (v) Loss of useful value occurring after the date of acquisition; (vi) Substantial damage to the buildings occurring after their acquisition; (vii) Discovery of latent structural defects in the buildings after their acquisition; (viii) Decline in the taxpayer's business after the date of acquisition; (ix) Condemnation of the property by municipal authorities after the date of acquisition; or (x) Inability after acquisition to obtain building material necessary for the improvement of the property.↩
6. In Herman Klayman,T.C. Memo. 1973-200, we followed the holding in First National Bank & Trust Co. of Chickasha v. United States,462 F. 2d 908↩ (10th Cir. 1972).
7. We do not consider that the construction of the car wash building was a substitution for the razed structures, so that under the rationale of Henry Phipps Estates,5 T.C. 964, 969↩ (1945), the venture's basis in the structures would be included in the basis of the car wash building since the car wash building was constructed on a different although contiguous site and it was not necessary to destroy the structures to build the car wash building.
8. Respondent does not contend that Mr. Butz' distributive share of the venture's loss was limited by the provisions of section 704(d). Further, respondent does not contend that there was any salvage value upon the demolition of the buildings that would require the amount of the loss to be adjusted for such salvage value.↩
9. SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES.
(a) Entertainment, Amusement, or Recreation. -- (1) In general.--No deduction otherwise allowable under this chapter shall be allowed for any item-- (A) Activity. --With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a substantial and bona fide business discussion (includingg business meetings at a convention or otherwise), that such item was associated with, the active conduct of the taxpayer's trade or business, or (B) Facility. --With respect to a facility used in connection with an activity referred to in subparagraph (A), unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business, and such deduction shall in no event exceed the portion of such item directly related to, or in the case of an item described in subparagraph (A) directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), the portion of such item associated with, the active conduct of the taxpayer's trade or business. (2) Special rules. --For purposes of applying paragraph (1)-- (A) Dues or fees to any social, athletic, or sporting club or organization shall be treated as items with respect to facilities. (B) An activity described in section 212↩ shall be treated as a trade or business. 10. SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES. (d) Substantiation Required. --No deduction shall be allowed-- (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or (3) for any expense for gifts, unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. The Secretary or his delegate may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations.↩
11. Section 1.274-2(e)(4)(i), Income Tax Regs., provides as follows: (4) Determination of primary use-- (i) In general. A facility used in connection with entertainment shall be considered as used primarily for the furtherance therance of the taxpayer's trade or business only if it is established that the primary use of the facility during the taxable year was for purposes considered ordinary and necessary within the meaning of sections 162 and 212 and the regulations thereunder. All of the facts and circumstances of each case shall be considered in determining the primary use of a facility. Generally, it is the actual use of the facility which establishes the deductibility of expenditures with respect to the facility; not its availability for use and not the taxpayer's principal purpose in acquiring the facility. Objective rather than subjective standards will be determinative. If membership entitles the member's entire family to use a facility, such as a country club, their use will be considered in determining whether business use of the facility exceeds personal use. The factors to be considered include the nature of each use, the frequency and duration of use for business purposes as compared with other purposes, and the amount of expenditures incurred during use for business compared with amount of expenditures incurred during use for other purposes. No single standard of comparison, or quantitative measurement, as to the significance of any such factor, however, is necessarily appropriate for all classes or types of facilities. For example, an appropriate standard for determining the primary use of a country club during a taxable year will not necessarily be appropriate for determining the primary use of an airplane. However, a taxpayer shall be deemed to have established that a facility was used primarily for the furtherance of his trade or business if he establishes such primary use in accordance with subdivision (ii) or (iii) of this subparagraph. Subdivisions (ii) and (iii) of this subparagraph shall not preclude a taxpayer from otherwise establishing the primary use of a facility under the general provisions of this subdivision.↩