OWENSBY & KRITIKOS, INC., PETRO-MARINE ENGINEERING, INC., AND SUBSIDIARIES, JOHN W. OWENSBY and DOLORES G. OWENSBY, THEODORE A. KRITIKOS and BE JO KRITIKOS, and DICK H. PINER, JR. and DOROTHY S. PINER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Owensby & Kritikos, Inc. v. Commissioner
Docket No. 26083-82.
United States Tax Court
T.C. Memo 1985-267; 1985 Tax Ct. Memo LEXIS 371; 50 T.C.M. (CCH) 29; T.C.M. (RIA) 85267; June 3, 1985. *371 During the years at issue, X and Y were corporations, and Z was a subchapter S corporation. X, Y, and Z provided a variety of services primarily to the offshore oil and gas industry. A and B were employees and the sole shareholders of X and Y. A, B, and C were employees and the sole shareholders of Z. X. Y, and Z were very successful, and A, B, and C were paid substantial amounts as compensation. Held, reasonable compensation for A, B, and C, including an amount for the value of stock options, determined. Paul H. Waldman,Norwood N. Hingle, Jr.,Michael E. Guarisco, and Michael H. Ellis, for the petitioners. Linda J. Bourquin, for the respondent. *372 SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioners' Federal income taxes: Petitioners
Taxable Year Ended
Deficiency
Owensby & Kritikos,
9/30/79
$51,724
Inc.
Petro-Marine Engineering,
Inc., and
10/31/78
208,544
Subsidiaries
9/30/79
197,122
John W. Owensby and
12/31/78
81,412
Dolores G. Owensby
12/31/79
73,001
Theodore A. Kritikos
12/31/78
79,871
and Be Jo Kritikos
12/31/79
74,550
Dick H. Piner, Jr.
12/31/78
45,734
and Dorothy S. Piner
12/31/79
51,328
The sole issue for decision is whether the amounts paid by the corporate petitioners and by Total Engineering Services Team, Inc. (TEST), to John W. Owensby, Theodore A. Kritikos, and Dick H. Piner, Jr., during the corporations' taxable years ending in 1978 and 1979 constituted reasonable compensation for services actually rendered within the meaning of section 162(a)(1) of the Internal Revenue Code of 1954. [1]
FINDINGS OF FACT Some of the facts *373 have been stipulated, and those facts are so found. Owensby & Kritikos, Inc. (O&K), and Petro-Marine Engineering, Inc., and Subsidiaries (PME) are both Louisiana corporations, and each had its principal place of business in Gretna, La., when the petition in this case was filed. All of the individual petitioners had their residences in New Orleans, La., when the petition in this case was filed. Both of the corporate petitioners filed their Federal income tax returns for the years at issue with the Internal Revenue Service Center, Austin, Tex., and all of the individual petitioners filed their Federal income tax returns for the years at issue with the same service center. O&K and PME will sometimes be referred to as the corporations, and Mr. Owensby, Mr. Kritikos, and Mr. Piner will sometimes be referred to as the individual petitioners. None of the individual petitioners is related by blood or marriage. Mr. Owensby graduated from the University of Oklahoma in 1953 with a degree in civil engineering. After college, he worked for the California Company (now Chevron) as an engineer. While working for the California Company, he participated in the design and installation of structures *374 used in the offshore oil industry. In 1959 Mr. Owensby went to work for Ike Haggard Machine Works, a welding and fabrication facility. While there, he was the manager of the yeard and supervised between 60 and 100 employees. Mr. Kritikos graduated from the University of Oklahoma in 1951 with a degree in civil engineering. Thereafter, he served in the U.S. Army in Korea as a company commander in an engineer combat battalion. His company built bridges, barracks, and other facilities and also laid and cleared mine fields. From 1953 to 1959, Mr. Kritikos worked for the California Company as a construction engineer, and he was involved in the design, installation, and servicing of oil and gas production facilities. In early 1959, he became the plant manager at A-1 Boiler and Machine Works, a combination machine and fabrication shop that serviced the oil industry and employed between 40 and 90 people. Mr. Owensby and Mr. Kritikos formed O&K in 1962 to provide engineeering, consulting, and inspection services to the oil and gas drilling and production industry both offshore and onshore.It was incorporated on October 23, 1962. O&K also provided visual and nondestructive testing services *375 to the marine and chemical industries. The income of O&K was derived from services such as inspection, testing, consulation, and drafting; capital was not a material income-producing factor. Since its incorporation, Mr. Owensby and Mr. Kritikos have been owned 50 percent of the stock of O&K. They each initially contributed $1,400 to the capital of O&K, and there have been no additional capital contributions. Since incorporation, Mr. Kritikos has been the president, and Mr. Owensby has been the executive vice president of O&K. They also have been the only members of the board of directors of O&K since its incorporation. O&K determined its income based on a fiscal year ending on October 31 for each year through 1978. Thereafter, it changed its fiscal year to a fiscal year ending on September 30. We shall refer to a fiscal year of O&K, PME, or TEST by the calendar year in which it ended. Mr. Owensby and Mr. Kritikos pioneered the development of ultrasonic thickness inspection services in the Gulf Coast region. When O&K was formed and during its early years, it had only three employees--Mr. Owensby, Mr. Kritikos, and a draftsman.From the formation of O&K through 1979, Mr. Owensby *376 and Mr. Kritikos worked long hours, often under harsh and sometimes dangerous conditions. During the years at issue, they each worked approximately 60 to 70 hours per week. Mr. Owensby and Mr. Kritikos were responsible for virtually all of the business generated for the company and were involved in every aspect of its operations. Their experience and personal contacts formed the cornerstone of the company's business. Although O&K grew substantially from 1974 through 1979, there were no material changes either in the nature of its business or in the comprehensive services performed for the company by Mr. Owensby and Mr. Kritikos. During the years at issue, O&K's customers included the major oil companies, major independents, drilling companies, shipyards, and fabrication plants. O&K comkpeted with companies such as J. McDermott and Brown & Root. At the end of the 1979 calendar year, O&K had a total of 81 employees--40 visual inspectors, 30 nondestructive testing personnel, and 11 office personnel. There were 69 employees located in Gretna, La., and 12 in Houston, Tex. O&K entered into work agreements with Mr. Owensby and Mr. Kritikos effective November 1, 1974. The agreements *377 were amended on December 3, 1977; the sole purpose of the amendments was to increase the guaranteed annual salaries of Mr. Owensby and Mr. Kritikos from $60,000 to $72,000. During the years at issue, each work agreement provided for a guaranteed annual salary of $72,000, an incentive bonus of 3 percent of the net volume of yearly business, and an additional bonus to be paid at the discretion of the board of directors. O&K also entered into work agreements with two of its other employees--Henry M. Witter and Huey G. Hinton--prior to the years at issue. Mr. Witter and Mr. Hinton were key employees of O&K during the years at issue, and they held management positions with the company. Mr. Witter's work agreement was effective as of June 1, 1974, and Mr. Hinton's work agreement was effective as of June 1, 1976. During the years at issue, Mr. Witter's work agreement provided for an incentive bonus equal to 2 percent of the net volume of business generated by his department and one-quarter of 1 percent of the net volume of business generated by O&K, plus 1 percent of the net volume of certain other work. Mr. Hinton's work agreement provided for an incentive bonus of 1 percent of the *378 net volume of business generated by O&K in its New Orleans and Houston branches. The work agreements of both Mr. Witter and Mr. Hinton also provided for additional bonuses to be paid at the discretion of O&K. The incentive bonuses in the O&K work agreements and in the PME and TEST work agreements were based on net sales which was a figure determined by deducting from gross sales certain costs, such as film, airplane tickets, and per diem, which were billed to the customers of the corporations and TEST but on which they made no profit. This method was used so that the employees could anticipate what their bonuses would be and so that bonuses would not be subject to any manipulation of the profits of the companies. In 1978, O&K paid Mr. Owensby and Mr. Kritikos each compensation of $152,760. Their compensation for 1978 is not broken down into salary and bonuses in the record. In 1979, O&K paid Mr. Owensby and Mr. Kritikos each $145,380 in salary and bonuses. Their total compensation consisted of 11 monthly payments of $6,000, an incentive bonus of $71,880, and a discretionary bonus of $7,500. During 1979, pursuant to his work agreement, Mr. Hinton was paid a total of $52,459, *379 consisting of a salary of $20,334, an incentive bonus of $29,625, and a discretionary bonus of $2,500. During 1979, Mr. Witter was paid a total of $41,687, consisting of a salary of $16,883, an incentive bonus of $22,304, and a discretionary bonus of $2,500. PME was incorported on August 4, 1969. It was formed by Mr. Owensby and Mr. Kritikos to provide consulting engineering services to the offshore petroleum and marine industries. PME specialized in the design, feasibility planning, and construction management of marine structural, process, and pipeline projects. PME was formed in order to separate the consulting engineering services provided by it from the services provided by O&K. Capital was not a material income-producing factor for PME. Since its incorporation, Mr. Owensby and Mr. Kritikos have each owned 50 percent of the stock of PME. They each initially contributed $1,000 to the capital of PME, and there have been no additional capital contributions. PME operated as a subchapter S corporation from November 1, 1970, until November 1, 1976, when it revoked its subchapter S election. During the years at issue, Mr. Owensby, Mr. Kritikos, and Edmond R. Genois, the company's *380 senior vice president, were the members of PME's board of directors. Prior to the years at issue, Mr. Owensby, Mr. Kritikos, and their spouses were the members of the board of directors. Since its incorporation, Mr. Owensby has been the president and Mr. Kritikos has been the executive vice president of PME. During the years at issue, William H. Linder was the vice president of processing engineering. PME determined its income based on a fiscal year ending on October 31 for each year through 1978. Thereafter, PME changed its accounting period to a fiscal year ending on September 30. PME's work was highly specialized. It established itself as a leader in its field primarily through the efforts of Mr. Owensby and Mr. Kritikos. During the years at issue, PME did work for most of the major oil companies, and it was involved in engineering and construction management on a number of offshore platforms. Some offshore platforms were as tall as 570 feet, or the equivalent of a 55-story building, and weighed as much as 12,500 short tons. Each offshore platform had to be designed for the environment in which it would be operating--from the shifting silt bottom of inshore Gulf of Mexico *381 waters to the 360-foot depths of the North Sea. During the formative years of PME, Mr. Owensby and Mr. Kritikos performed virtually all the services that the company provided, including engineering, drafting, and the writing of specifications. During the years at issue, Mr. Owensby and Mr. Kritikos continued to be engaged in engineering, drafting, and specification writing, in addition to being primarily responsible for the company's sales and its employee recruiting and training. As of the end of the 1979 calendar year, PME had 243 employees--152 engineers and specialists, 42 drafters and maintenance personnel, 33 clerical personnel, and 16 accounting personnel. There were 189 located in Gretna, La., 3 in Lafayette, La., and 51 in Houston, Tex.
Mr. Owensby and Mr. Kritikos were primarily responsible for the vast majority of PME's sales during the years at issue. Mr. Piner was responsible for obtaining some business for PME; however, he received no compensation from PME. Mr. Owensby and Mr. Kritikos personally secured for PME a large contract for quality assurance services from the Louisiana Offshore Oil Port, Inc. (LOOP). LOOP involved the construction of a deep water offshore *382 port in the Gulf of Mexico designed to accommodate the trnasfer of oil from super-tankers which were too large to utilize ports in the United States. PME's LOOP contract was the largest contract that it had for quality assurance work during the years at issue. PME entered into work agreements with Mr. Owensby and Mr. Kritikos effective November 1, 1974. During the years at issue, the work agreements remained substantially unchanged and provided for a guaranteed annual salary of $120,000, an incentive bonus of 3 percent of the net volume of yearly business, and an additional bonus to be paid at the discretion of the board of directors. PME also entered into work agreements with Mr. Genois and Mr. Linder effective as of November 1, 1973. During the years at issue, the work agreement with Mr. Genois provided for an incentive bonus based on 1 percent of the net volume of yearly business. Mr. Linder's work agreement, in effect during 1978, provided for an incentive bonus of 1 percent of net volume with a limit on the amount of business that would be considered for bonus purposes; the limit on the amount of business that would be considered was not used during 1978. For 1979, his *383 work agreement provided for an incentive bonus of three-quarters of 1 percent of the amounts billed through the New Orleans, Lafayette, and Houston offices multiplied by an efficiency factor contained in the work agreement. Although both Mr. Genois and Mr. Linder had some management responsibilities, all major corporate decisions were made by Mr. Owensby and Mr. Kritikos, and neither Mr. Genois nor Mr. Linder generated significant sales for PME during the years at issue. In 1978, PME paid Mr. Owensby and Mr. Kritikos each $473,211 in salary and bonuses. They each received 12 monthly payments of $10,000, an incentive bonus of $303,211, and a discretionary bonus of $50,000. In 1979, PME paid Mr. Owensby and Mr. Kritikos each $512,699 [2] in salary and bonuses, comprised of 12 monthly payments of $10,000, an incentive bonus of $364,699, and a discretionary bonus of $28,000. In 1978, PME paid Mr. Genois $159,737, and it paid Mr. Linder $138,833. Their compensation for 1978 is not broken down into salary and bonuses *384 in the record. In 1979, PME paid Mr. Genois $200,806, comprised of a salary of $42,112, a $141,894 incentive bonus, and a $16,800 discretionary bonus. PME paid Mr. Linder $148,574 in 1979, comprised of a salary of $40,621, an incentive bonus of $99,553, and a discretionary bonus of $8,400. TEST was incorporated on May 15, 1970. Since 1970, and during the years in issue, TEST was a subchapter S corporation. It was formed to provide engineering, safety, and environmental protection services for petroleum production platforms and facilities. Since its incorporation, Mr. Piner has owned 50 percent of the stock of TEST, and Mr. Owensby and Mr. Kritikos each has owned 25 percent of the stock. Mr. Piner initially contributed $500 to the capital of TEST; Mr. Owensby and Mr. Kritikos each contributed $250. There have been no additional capital contributions. Since its incorporation, Mr. Piner has been the president of TEST. Mr. Owensby has been the vice president, and Mr. Kritikos has been the secretary/treasurer. Mr. Piner, Mr. Owensby, and Mr. Kritikos have been the only members of the board of directors of TEST since its incorporation. TEST determined its income based on a fiscal *385 year ending on April 30. TEST was primarily a service business; although it sold some products, no significant part of its profits was attributable to either capital or the sale of products. Mr. Piner holds a degree in mechanical engineering from Texas A & M University. Prior to the formation of TEST, he was employed for 17 years by the National Tank Company. Mr. Piner's investiveness contributed significantly to National Tank's operations, and his career progressed steadily, until he left the company in 1970 to form TEST with Mr. Owensby and Mr. Kritikos. At National Tank, Mr. Piner's work was directly related to oil and gas production in the Gulf of Mexico and the South Louisiana marshland. Initially, Mr. Piner hired and trained the personnel that were to form the basis for TEST's future growth. During the years at issue, TEST provided approximately 30 products and services, including a corrosion-proof relay switch which came to be used by the entire industry and which significantly extends the reliable life of offshore safety equipment. Mr. Piner personally tested, maintained, designed, and installed safety and antipollution systems for TEST. He also did liaison work *386 in the emerging area of Government regulation of offshore drilling and production operations. TEST was a pioneer in its industry. Its work was highly specialized and required constant awareness of technical developments and complex Government regulation.Mr. Piner performed the first United States Geological Survey safety inspection in 1970, and he developed spill prevention control counter measure plans to prevent hydrocarbon spills into navigable waterways. In addition, TEST provided safety training for the personnel of many of the major oil companies, including Exxon and Chevron. Mr. Piner designed the training course, wrote the course manuals, and taught the first course. At TEST, Mr. Piner initiated third-party testing of safety devices, a service that is now used by a large part of the oil exploration and production industry. This service has never before been offered by any other company in the world. It has since become a source of considerable income for TEST. Mr. Piner devotes his full time to his work at TEST. During the years at issue, he worked long hours, including nights and weekends, often under hazardous conditions. Mr. Owensby and Mr. Kritikos were directly *387 involved in management and in securing sales for TEST. Much of the success of TEST was attributable to their efforts and their contacts in the offshore oil industry. Mr. Piner, Mr. Owensby, and Mr. Kritikos conferred almost daily during the years at issue; together they set company policies, decided on new business ventures, and discussed proposed changes in TEST's operations. As of the end of the 1978 calendar year, TEST had 244 employees, located as follows: Office
Draftsmen/
Office and
Location
Technicians
Purchasing
Salesmen
Engineers
Total
Gretna
90
73
3
5
171
Houston
5
2
1
0
8
Alaska
15
7
0
0
22
Oklahoma
2
0
1
0
3
Lafayette
32
7
1
0
40
TEST entered into work agreements with Mr. Piner, Mr. Owensby, and Mr. Kritikos, effective January 1, 1975. Mr. Piner's work agreement provided for a guaranteed annual salary of $72,000, an incentive bonus of 2 percent of profits, and an additional bonus at the discretion of the board of directors keyed to profits. The work agreements of Mr. Owensby and Mr. Kritikos provided for each of them a guaranteed annual salary of $28,000, an incentive bonus of 1 percent of company *388 profits, and an additional bonus at the discretion of the board of directors keyed to profits. TEST's bonus payments made to its key employees during 1978 and 1979 were not calculated pursuant to the work agreements. Instead, Mr. Piner's bonuses for 1978 and 1979 were preliminarily determined by Mr. Owensby and Mr. Kritikos without consulting Mr. Piner. They determined the bonuses based on their evaluation of Mr. Piner's contribution to TEST. Mr. Piner accepted their recommendations with respect to his bonuses for 1978 and 1979. After determining Mr. Piner's bonus, TEST's board of directors--Mr. Owensby, Mr. Kritikos, and Mr. Piner--determined the bonuses to be paid to the other key employees of TEST--Mr. Kritikos, Mr. Owensby, and David E. Manning. Such bonuses were based on the value of the services of each employee to the corporation. During 1978 and 1979, TEST also had a work agreement in effect with Mr. Manning, who was then the executive vice president of TEST. Mr. Manning's work agreement, effective as of May 1, 1974, provided for an incentive bonus of 3 percent of company profits. Although Mr. Manning was a key employee of TEST, he was not responsible for any major *389 policy decisions, nor was he responsible for generating any significant amount of sales. TEST's sales were primarily generated by Mr. Owensby, Mr. Kritikos, and Mr. Piner; they also made all management decisions. During the years at issue, TEST paid the following compensation to Mr. Piner, Mr. Owensby, and Mr. Kritikos: Total
Compensation
Salary
Bonus
1978
Mr. Piner
$779,300
$72,000
$707,300
Mr. Owensby
228,000
28,000
200,000
Mr. Kritikos
228,000
28,000
200,000
1979
Mr. Piner
[3] $525,000
$72,000
$453,000
Mr. Owensby
185,000
28,000
157,000
Mr. Kritikos
185,000
28,000
157,000
During 1978, Mr. Manning received $116,434 in compensation, comprised of a salary of $36,924 and a bonus of $79,510. During 1979, he received $105,673 in compensation, comprised of a salary of $53,443 and a bonus of $52,230. During the years at issue, neither O&K nor PME paid any dividends. The only dividend paid by either O&K or PME prior to the years at issue was a dividend of $890,721 paid by *390 PME in 1977. Mr. Owensby, Mr. Kritikos, and Mr. Piner each enjoyed exceptional reputations in his industry, and each of them was always available to assist the customers of the corporations and TEST. Mr. Owensby and Mr. Kritikos were personally liable for loans made to the corporations. The Commissioner examined the income tax returns of O&K, PME, and TEST for 1976 and 1977. The examinations did not result in the disallowance of any of the companies' claimed deductions for officers' compensation. O&K, PME, and TEST did not change their compensation programs as a result of such examination. The companies relied on the results of the audit in deciding not to change their compensation programs. According to Business Week, the five highest paid U.S. executives and the executives who were the 21st through the 25th highest paid during 1978 and 1979 were as follows: 1978
Gains from
options
and/or stock
appreciation
Corporate
Salary
rights
Total com-
& Bonus
exercised
pensation [4]
Sales
Profits
(Thousands of dollars)
David Mahoney,
chmn.,
Norton Simon
$917
$1,120
[5] $2,037
$2,429,000
$116,000
Archie R.
McCardell,
pres.,
International
Harvester
[6] 1,907
1,907
6,664,000
187,000
Harry J. Gray,
chmn.,
United
Technologies
712
971
1,683
6,265,000
234,000
T. A. Wilson,
chmn.,
Boeing
517
710
1,227
5,463,000
323,000
M. T. Stamper,
pres.,
Boeing
293
922
1,215
5,463,000
323,000
Edward G.
Harness,
chmn.,
Proctor
& Gamble
618
234
852
8,100,000
512,000
Richard L.
Terrell,
vice chmn., [7]
General Motors
850
850
63,221,000
3,500,000
Irving S.
Shapiro,
chmn.,
Du Pont
843
843
10,584,000
786,000
William F.
Laporte,
chmn.,
American
Home Products
830
830
3,277,000
348,000
Fred L. Hartley,
chmn.
& pres.,
Union Oil
of Calif.
729
75
804
6,340,000
382,000
*391 1979
Long-
Corporate
Salary
Term
Total com-
& Bonus
Income
pensation
Sales
Profits
(Thousands of Dollars)
Frank E. Rosenfelt,
pres. & CEO, MGM
$194
$4,869
$5,063
$491,000
$62,000
Rawleigh Warner, Jr.,
chmn., Mobil
902
3,411
4,313
47,900,000
2,010,000
Richard W. Vieser,
exec. vice pres.,
McGraw-Edison
76
2,559
2,635
1,331,000
63,000
Barrie K. Brunet,
exec. vice pres.,
MGM
121
2,330
2,451
491,000
62,000
Paul P. Woolard, sr.
exec. vice pres.,
Revlon
630
1,738
2,368
1,718,000
153,000
Henry Wendt, pres. &
COO, SmithKline
301
955
1,256
1,352,000
234,000
M. T. Stamper, pres.,
Boeing
339
820
1,159
8,131,000
505,000
Robert F. Dee, chmn. &
CEO, SmithKline
406
736
1,142
1,352,000
234,000
H. S. Geneen, chmn., [8]
ITT
636
480
1,116
17,197,000
381,000
C. C. Garvin, Jr.,
chmn., Exxon
830
248
1,078
84,350,000
4,295,000
During 1978, for the 25 highest paid U.S. executives, long-term income was 32 percent of their salaries and bonuses according to the figures reported by Business Week. During 1979, according to Business Week's figures, such executives received long-term *392 income, mainly stock options and stock appreciation rights, that was 281 percent of their salaries and bonuses. The following charts contain the gross receipts, the taxable income (before the petitioners' compensation), the petitioners' compensation, the petitioners' compensation as a percent of gross receipts, and the petitioners' compensation as a percent of taxable income (before the petitioners' compensation), as well as equity as of the beginning of the year and return on equity for O&K, PME, and TEST during the years 1974 through 1979: O & K
1974
1975
1976
1977
Gross receipts
$691,708
$1,276,538
$2,227,948
$2,397,144
Taxable income
$ 238,898
$ 348,333
$ 346,669
Petitioners'
compensation
$120,000
$ 198,490
$ 268,732
$ 284,772
Petitioners'
compensation as
percent of gross
receipts
17.3
15.5
12.1
11.9
Petitioners'
compensation as
percent of
taxable income
83.1
77.1
82.1
Equity as of
beginning of
year
$123,315
$ 129,047
$ 127,863
$ 164,695
Return on
equity
(percent)
16.9
27.8
50.3
26.2
*393 1978
1979
Gross receipts
$2,888,496
$3,100,318
Taxable income
$ 393,889
$ 398,400
Petitioners'
compensation
$ 305,520
$ 290,760
Petitioners'
compensation as
percent of gross
receipts
10.6
9.4
Petitioners'
compensation as
percent of
taxable income
77.6
73.0
Equity as of
beginning of
year
$ 187,074
$ 209,515
Return on
equity
(percent)
29.3
32.5
PME
1974
1975
1976
1977
Gross receipts
$1,326,533
$3,181,378
$5,230,855
$5,168,384
Taxable income
$1,091,414
$1,589,725
$1,315,158
Petitioners'
compensation
$ 420,000
$ 601,196
$ 699,004
$ 649,616
Petitioners'
compensation as
percent of gross
receipts
31.7
18.9
13.4
12.6
Petitioners'
compensation as
percent of
taxable income
55.1
44.0
49.4
Equity as of
beginning of
year
$ 16,455
$ 26,209
$ 484,461
$ 912,422
Return on
equity
(percent)
71.7
1793.5
183.9
39.0
1978
1979
Gross receipts
$11,624,822
$12,980,211
Taxable income
$ 2,899,940
$ 2,099,790
Petitioners'
compensation
$ 946,422
$ 1,025,398
Petitioners'
compensation as
percent of gross
receipts
8.1
7.9
Petitioners'
compensation as
percent of
taxable income
32.6
48.8
Equity as of
beginning of
year
$ 377,450
$ 1,419,292
Return on
equity
(percent)
276.0
49.9
*394 TEST
1974
1975
1976
1977
Gross receipts
$1,399,845
$1,550,689
$2,146,665
$2,556,884
Taxable income
$ 235,909
$ 366,023
$ 437,409
Petitioners'
compensation
$ 272,535
$ 232,863
$ 363,000
$ 428,000
Petitioners'
compensation as
percent of gross
receipts
19.5
15.0
16.9
16.7
Petitioners'
compensation as
percent of
taxable income
98.7
99.2
97.8
Equity as of
beginning of
year
$ 1,000
$ 1,000
$ 1,000
$ 1,000
Return on
equity
(percent)
446.6
304.6
302.3
940.9
1978
1979
Gross receipts
$5,713,067
$8,474,638
Taxable income
$1,340,199
$ 897,813
Petitioners'
compensation
$1,235,300
$ 895,000
Petitioners'
compensation as
percent of gross
receipts
21.6
10.6
Petitioners'
compensation as
percent of
taxable income
92.2
99.7
Equity as of
beginning of
year
$ 1,000
$ 5,899
Return on
equity
(percent)
10,489.9
47.7
CONSOLIDATED
1974
1975
1976
1977
Gross receipts
$3,418,086
$6,008,605
$9,605,468
$10,122,412
Taxable income
$1,566,221
$2,304,081
$ 2,099,236
Petitioners'
compensation
$ 812,535
$1,032,549
$1,330,736
$ 1,362,388
Petitioners'
compensation as
percent of gross
receipts
23.8
17.2
13.9
13.5
Petitioners'
compensation as
percent of
taxable income
65.9
57.8
64.9
Equity as of
beginning of
year
$ 140,770
$ 156,256
$ 613,324
$1,078,117
Return on
equity
(percent)
26.4
325.7
156.2
37.9
*395 1978
1979
Gross receipts
$20,226,385
$24,555,167
Taxable income
$ 4,634,028
$ 3,396,003
Petitioners'
compensation
$ 2,487,242
$ 2,211,158
Petitioners'
compensation as
percent of gross
receipts
12.3
9.0
Petitioners'
compensation as
percent of
taxable income
53.7
65.1
Equity as of
beginning of
year
$ 565,524
$ 1,634,706
Return on
equity
(percent)
212.5
47.6
In his notices of deficiency to the individual petitioners, the Commissioner determined that reasonable compensation for Mr. Owensby, Mr. Kritikos, and Mr. Piner during the years at issue was as follows: 1978
O&K
PME
TEST
Total
Mr. Owensby
$ 81,200
$305,977
$37,035
$424,212
Mr. Kritikos
81,200
305,977
37,035
424,212
Mr. Piner
269,556
269,556
1979
Mr. Owensby
[9] $112,492
$299,981
$46,185
$458,658
Mr. Kritikos
[9] 112,492
299,981
46,185
458,658
Mr. Piner
283,844
283,844
*396 OPINION The sole issue for decision is whether the amounts paid by the corporations and by TEST to the individual petitioners during the years at issue constituted reasonable compensation for services actually rendered within the meaning of section 162(a)(1), which provides: (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; The question is one of fact to be resolved on the basis of an examination of all the facts and circumstances of the case. Charles Schneider & Co. v. Commissioner,500 F.2d 148, 151 (8th Cir. 1974), affg. a Memorandum Opinion of this Court; Pacific Grains, Inc. v. Commissioner,399 F.2d 603, 605 (9th Cir. 1968), affg. a Memorandum Opinion of this Court. The burden of proving the reasonableness of the compensation is upon the individual and corporate petitioners. Botany Worsted Mills v. United States,278 U.S. 282 (1929); The Barton-Gillet Co. v. Commissioner,442 F.2d 1343 (4th Cir. 1971), *397 affg. per curiam a Memorandum Opinion of this Court. The factors considered relevant in determining the reasonableness of compensation include: the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * [Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court.] See also Commercial Iron Works v. Commissioner,166 F.2d 221, 224 (5th Cir. 1948), affg. a Memorandum Opinion of this Court. No single factor is decisive; rather, we must consider and weigh the totality of facts and circumstances in arriving at our decision. Mayson Mfg. Co. v. Commissioner,supra. *398 Where officer-shareholders, who are in control of a corporation, set their own compensation, careful scrutiny is required to determine whether the alleged compensation is in fact a distribution of profits. Charles Schneider & Co. v. Commissioner,500 F.2d at 152; Logan Lumber Co. v. Commissioner,365 F.2d 846, 851 (5th Cir. 1966), affg. on this issue a Memorandum Opinion of this Court; Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142, 1156 (1980); Levenson & Klein, Inc. v. Commissioner,67 T.C. 694, 711 (1977). As illustrated by the regulations under section 162, careful scrutiny in the case of closely held corporations is justified where compensation practices suggest dividend distributions: (1) Any amount paid in the form of compensation, but not in fact as the purchase price of services is not deductible. An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services *399 and the excessive payments correspond or bear a close relationship to the stockholdings of the officers of employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. * * * [Sec. 1.162-7(b)(1), Income Tax Regs.] The parties are in agreement with respect to a number of the factors relevant in determining reasonable compensation. They agree that Mr. Owensby, Mr. Kritikos, and Mr. Piner were all highly qualified for the positions that they held; that they were extremely hard-working and dedicated; and that their efforts on behalf of their respective employers contributed significantly to the substantial growth and success of the corporations and TEST. The parties also agree that the corporations and TEST were involved in a very complex and specialized industry, the offshore oil and gas industry. Finally, the parties agree that, during the years at issue, the prevailing economic conditions were favorable in the oil and gas industry but that such favorable conditions did not materially account for the growth and success of the corporations and TEST. With respect to other *400 relevant facts, the parties disagree. The factors about which the parties agree weight heavily in the petitioners' favor. The individual efforts of Mr. Owensby, Mr. Kritikos, and Mr. Piner were largely responsible for the substantial growth and success of the corporations and TEST, and such efforts warrant commensurately substantial compensation. Furthermore, it is appropriate to take into consideration the fact that the corporations and TEST grew at a significant rate and were successful in a highly specialized and complex industry. In addition, Mr. Owensby and Mr. Kritikos were personally liable for loans made to the corporations. See R.J. Nicoll Co. v. Commissioner,59 T.C. 37, 51 (1972). However, the record does not reveal the extent of such loans. We also believe that the salary policy of the corporations and TEST with respect to all employees supports the payment of substantial compensation to the individual petitioners in the present case. Non-shareholder employees were handsomely compensated by O&K, PME, and TEST, and those employees received very substantial incentive bonuses. This kind of salary policy supports the payment of substantial compensation *401 to the individual petitioners in the present case. Home Interiors & Gifts, Inc. v. Commissioner,supra at 1159. Resolution of the issue in the present case requires that we determine as best we can, based on the record before us, what compensation would have been paid during the years at issue for like services by like enterprises under like circumstances. Sec. 1.162-7(b)(3), Income Tax Regs.The parties make a number of arguments concerning the weight to be afforded to the various relevant factors. We will discuss their arguments and evidence in turn. [10]
*402 First, careful scrutiny of the compensation paid in the present case is warranted by the fact that, for the most part, the compensation paid to Mr. Owensby, Mr. Kritikos, and Mr. Piner was paid in proportion to their stock ownership in the corporations and TEST. During the years 1974 through 1979, Mr. Owensby and Mr. Kritikos, who were both 50-percent shareholders in O&K and in PME, were paid exactly the same amounts as compensation by the two companies. In the case of TEST, they were also each 25-percent shareholders, and they were paid exactly the same amounts by TEST. Although Mr. Piner, a 50-percent stockholder in TEST, received somewhat more than the combined compensation of Mr. Owensby and Mr. Kritikos, he was largely responsible for TEST, but he was a less than 50-percent owner of the combined businesses of O&K, PME, and TEST. On this record, there is a strong suggestion that stock ownership influenced the payment of compensation. To support their claim that their compensation from O&K and PME was reasonable, Mr. Owensby and Mr. Kritikos rely on the fact that the compensation at issue was paid pursuant to agreements, entered into by them with the corporations prior to *403 the years at issue. They claim that such agreements were entered into on an arm's length basis, and they point to the fact that nonshareholder-employees were also covered by similar agreements. Section 1.162-7(b)(2), Income Tax Regs., provides: (2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. It is true that contracts providing for incentive bonuses were also entered into with certain nonowner key *404 employees and that the contracts with Mr. Owensby and Mr. Kritikos were made prior to the years at issue and at a time when the profitability of the businesses and the consequences of the bonus arrangements could not have been anticipated. Yet, the contracts between Mr. Owensby and Mr. Kritikos, on the one hand, and O&K or PME, on the other hand, were not free contracts. Those individuals wholly owned those corporations, and the contracts resulted in the payment of compensation in exact proportion to their ownership interests. Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,528 F.2d 176, 181 (10th Cir. 1975), affg. 61 T.C. 564 (1974); Hammond Lead Products, Inc. v. Commissioner,425 F.2d 31, 33 (7th Cir. 1970), affg. a Memorandum Opinion of this Court; Adams Tooling, Inc. v. Commissioner,33 T.C. 65, 74 (1959), affd. 289 F.2d 554 (7th Cir. 1961). Such contracts resulted in the distribution of the profits of O&K and PME to Mr. Owensby and Mr. Kritikos in exactly the same proportion as if they had been paid as dividends. Moreover, since Mr. Owensby and Mr. Kritikos were owners of the corporations, *405 there is a question as to whether bonuses needed to be paid to them to serve as incentives for increased performance--as owners, they would receive the profits of the business in the same proportions as they received bonuses. See Charles Schneider & Co. v. Commissioner,500 F.2d at 153; City Chevrolet Co. v. Commissioner,228 F.2d 894, 894-895 (4th Cir. 1956), affg. per curiam a Memorandum Opinion of this Court; University Chevrolet Co. v. Commissioner,16 T.C. 1452, 1455 (1951), affd. 199 F.2d 629 (5th Cir. 1952); but see Elliotts, Inc. v. Commissioner,716 F.2d 1241, 1248 (9th Cir. 1983), revg. a Memorandum Opinion of this Court. In addition, in the case of TEST, the bulk of the compensation paid to Mr. Owensby, Mr. Kritikos, and Mr. Piner constituted bonuses which were not paid pursuant to any pre-existing agreement; those bonuses were decided upon by the board of directors at the close of the taxable year. Bonuses declared at the end of the year when the earnings of a business are known must be closely scrutinized. See Pacific Grains, Inc. v. Commissioner,399 F.2d at 605-607; *406 Ecco High Frequency Corp. v. Commissioner,167 F.2d 583, 584-585 (2d Cir. 1948), affg. a Memorandum Opinion of this Court; Boyle Ruel Co. v. Commissioner,53 T.C. 162, 171 (1969). The amounts of the bonuses appear to have largely depended upon the profits of the business and the recipient's ownership interest. The pattern of paying bonuses in this manner constitutes convincing evidence that some part of the payments was not for compensation. See Pacific Grains, Inc. v. Commissioner,399 F.2d at 605-607; Huckins Tool & Die, Inc. v. Commissioner,289 F.2d 549, 553 (7th Cir. 1961), affg. a Memorandum Opinion of this Court; compare Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. at 1159-1161. To demonstrate the reasonableness of the compensation paid in the present case, the petitioners urge us to compare the compensation to the companies' gross income. On the other hand, the Commissioner, to demonstrate the unreasonableness of the compensation paid, urges us to compare the compensation with the companies' net profits. The compensation of the individual petitioners as a percentage of the gross *407 income of the companies declined for each company during each of the years 1974 through 1979, except for TEST in the years 1976 and 1978 where such percentages rose somewhat. However, when the compensation at issue is compared to taxable income before officer-shareholders compensation, the percentages are striking. In the case of TEST, virtually all of the taxable income was paid out as compensation to the individual petitioners--92.2 percent in 1978 and 99.7 percent in 1979. In the case of O&K, most of the taxable income was paid out as compensation to the individual petitioners--77.6 percent in 1978 and and 73.0 percent in 1979. Although PME retained most of its taxable income, there is a pattern, when the businesses are viewed as a whole, of distributing most of the taxable income as compensation to the shareholder-employees. The petitioners argue that the lack of dividends in the present case should not be accorded very much weight since shareholders may participate in the success of a corporation either through dividends or through appreciation in the value of their stock where dividends are not paid and funds are retained in the corporation. Stanley E. Ellington, Jr., *408 who testified as a financial expert on behalf of the petitioners, calculated the average return on equity for the companies used as comparables to O&K, PME, and TEST in the petitioners' expert report as 13.0 percent for 1978 and 17.8 percent for 1979. In support of their argument, the petitioners cite the Ninth Circuit's opinion in Elliotts, Inc. v. Commissioner,716 F.2d 1241 (1983), revg. a Memorandum Opinion of this Court, and Home Interiors & Gifts, Inc. v. Commissioner,supra.In the present case, as set out in our findings of fact, return on equity, although erratic, was substantial, especially during the years at issue. In addition, the return on equity for O&K, PME, and TEST was much greater than that of public companies. However, during the years at issue, which were profitable years for O&K, PME, and TEST, neither O&K nor PME paid any dividends to its shareholders. While we believe that return on equity is a factor which weighs in the petitioners' favor, ultimately, we must consider all the factors present in this case. The Commissioner argues that the nature, extent, and scope of the work performed by Mr. Owensby, Mr. Kritikos, *409 and Mr. Piner did not materially change during the years at issue, and since in the years before the years at issue, they were paid considerably less, such fact indicates that their compensation during the years at issue was excessive.However, the growth of O&K, PME, and TEST indicates otherwise. All three companies experienced significant growth during the 1970s. It is rather obvious that the extent of the work required from the three individual petitioners must have increased during the years at issue when compared to earlier years. Although their duties remained the same in that they were ultimately responsible for the three companies both before and during the years at issue, with the growth in O&K, PME, and TEST, it is fairly clear that there must have been commensurately more work entailed in managing larger, more active, and more complex companies. Thus, the Commissioner's argument is not convincing. In the present case, we believe that the compensation practices of comparable companies and expert testimony concerning such compensation practices are the most important considerations. Each of the parties has presented expert testimony designed to show what amounts of compensation *410 were paid during the years at issue for like services by like enterprises under like circumstances. Unfortunately, the parties' expert witnesses are very far from being in agreement. In large measure, the result in this case depends on how convincing we find the parties' expert testimony and expert reports. We are not obligated to accept the opinion of an expert witness where the record before us does not support his conclusions or where an expert's opinion is contrary to our own judgment. Barry v. United States,501 F.2d 578, 581-583 (6th Cir. 1974); Tripp v. Commissioner,337 F.2d 432, 434 (7th Cir. 1964), affg. a Memorandum Opinion of this Court; R.H. Oswald Co. v. Commissioner,185 F.2d 6, 8-9 (7th Cir. 1950), affg. a Memorandum Opinion of this Court; Roth Office Equipment Co. v. Gallagher,172 F.2d 452, 456 (6th Cir. 1949). We may accept or reject expert testimony, whichever, in our best judgment, is appropriate. Helvering v. National Grocery Co.,304 U.S. 282, 294 (1938); Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court; *411 Chiu v. Commissioner,84 T.C. 722 (1985). The following chart shows the total compensation paid to each individual petitioner by each of the corporations and by TEST, the amounts allowed by the Commissioner as reasonable compensation, and the amounts determined to be reasonable compensation by the petitioners' expert witnesses and by the Commissioner's expert witnesses: 1978
Petr's
Expert
Commissioner's
A.S.
Experts
Hansen
Mr.
Mr.
Total
Allowed
Inc.
Brennan
Gruenfeld
O & K
Mr. Owensby
$152,760
[11] $81,200
$655,403
$82,200
$19,000
Mr. Kritikos
152,760
[11] 81,200
655,403
148,600
19,000
PME
Mr. Owensby
473,211
255,977
546,376
126,600
58,000
Mr. Kritikos
473,211
255,977
546,376
69,400
58,000
TEST
Mr. Owensby
228,000
37,035
344,547
64,600
28,000
Mr. Kritikos
228,000
37,035
344,547
64,600
28,000
Mr. Piner
779,300
269,556
655,403
162,000
90,000
Total
Mr. Owensby
853,971
374,212
[12] 1,019,924
273,400
105,000
Mr. Kritikos
853,971
374,212
[12] 1,019,924
282,600
105,000
Mr. Piner
779,300
269,556
649,253
162,000
90,000
1979
Petrs'
Expert
Commissioner's
A.S.
Experts
Hansen
Mr.
Mr.
Total
Allowed
Inc.
Brennan
Gruenfeld
O&K
Mr. Owensby
$145,380
$89,496
$626,861
$80,000
$25,000
Mr. Kritikos
145,380
89,496
626,861
121,600
25,000
PME
Mr. Owensby
512,699
299,493
560,065
165,000
88,000
Mr. Kritikos
512,699
299,493
560,065
83,800
88,000
TEST
Mr. Owensby
185,000
41,108
338,240
86,300
32,000
Mr. Kritikos
185,000
41,108
338,240
86,300
32,000
Mr. Piner
525,000
253,683
626,861
174,700
125,000
Total
Mr. Owensby
843,079
430,097
[13] 992,868
331,300
145,000
Mr. Kritikos
843,079
430,097
[13] 992,868
291,700
145,000
Mr. Piner
525,000
253,383
[13] 614,013
174,700
125,000
*412 The petitioners' expert report was written by A.S. Hansen, Inc., a compensation consulting firm with considerable experience in working with clients in the oil and gas industry, as well as other energy related industries. The three individuals who worked on the report were Arthur A. Handy, Jr., Hoyt W. Doyel, and Gregory S. Reisinger. Mr. Handy and Mr. Reisinger also testified at trial. The Hansen report used publicly owned companies as comparable since, according to the report, compensation information is typically available only from such companies. Initially, 34 companies, identified as either consulting engineering, consulting services-management and public relations, or oil exploration and production companies, *413 were chosen. Of the 34 companies initially chosen, 18 were identified as consulting engineering companies and 16 were identified as oil and gas companies. Of these 34, the petitioners' experts stated that proxy statements were available for only 23 companies. The 23 companies were broken down into 3 categories--companies in the top 25 percent in terms of compensation for all companies, companies with annual revenues from $10 to $30 million, and companies with annual revenues less than $10 million. Twenty companies were used as comparables in calculating reasonable compensation for the years at issue. For each of the three categories, the petitioners' experts determined what total cash compensation would be for the highest, second highest, and third highest paid average performer, above-average performer, and outstanding performer. For 1978 and 1979, the petitioners' experts determined that reasonable cash compensation in each of the three categories was as follows: Highest
Second Highest
Third Highest
Paid
Paid
Paid
1978
Annual Revenues of Less than $10 Million
Average
$ 82,700
$ 66,587
$ 57,187
Above Average
103,375
83,234
71,481
Outstanding
147,678
118,905
102,116
Annual Revenues of $10 to $30 Million
Average
$133,725
$117,204
$110,787
Above Average
167,156
146,505
138,484
Outstanding
238,794
209,293
197,834
Top 25 percent of All Companies
Average
$246,944
$171,430
$136,846
Above Average
308,680
214,287
171,057
Outstanding
440,971
306,125
244,367
1979
Annual Revenues of Less than $10 Million
Average
$ 66,716
$ 63,055
$ 57,660
Above Average
83,395
78,819
72,075
Outstanding
119,136
112,598
102,964
Annual Revenues of $10 to $30 Million
Average
$141,391
$ 87,568
$ 78,618
Above Average
176,738
109,460
98,272
Outstanding
252,484
156,371
140,389
Top 25 Percent of All Companies
Average
$231,793
$151,696
$133,098
Above Average
289,741
189,620
166,372
Outstanding
413,915
270,885
237,675
*414 The Hansen report takes the position that the value of stock options should be taken into account in determining what would be comparable compensation in a public corporation for the services performed by the individual petitioners for O&K, PME, and TEST. The report calculated the value of stock options granted during the period from 1978 through 1981 by first dividing the total value of such options by 4 to determine the average value of the stock options on a yearly basis. [14] The report then computed "the total compensation opportunity" for executives in public companies according to three performance levels--average, above average, and outstanding; the previously determined cash compensation was added to the average value of the stock options. The following chart contains the Hansen report's determination of the average stock value for the highest, second highest, and third highest paid individuals *415 in public companies in the three categories used in the report: 1978 and 1979
Second
Third
Highest
Highest
Highest
Paid
Paid
Paid
Companies with annual revenues of less than $10 million
$1,015,450
$451,284
[15] $649,015
Companies with annual revenues of $10 to $30 million
$ 615,163
$310,418
[15] $331,162
Companies in the top 25 percent of compensation
$1,157,906
$686,256
$552,448
Finally, the Hansen report calculated what it termed "a more conservative and reasonable result" by adding 50 percent of the average stock value to the cash compensation to determine reasonable compensation for the individual petitioners. The Commissioner presented reports and testimony from two experts. His first expert, Ernest Gruenfeld, was an attorney in the Internal Revenue Service's Valuation Analysis Section who had some experience in compensation matters. His determinations of what would be reasonable compensation in the present case were based on information obtained *416 from the proxy statements of public companies that he had determined were similar to O&K, PME, and TEST. We shall not discuss Mr. Gruenfeld's report at length. His determinations of what would be reasonable compensation in the present case are so much lower than those of the other experts and are so much lower than the compensation allowed in the Commissioner's notice of deficiency that they do not warrant further consideration. The Commissioner's second expert witness, E. James Brennan, was the president of Brennan, Thomsen Associates, Inc., a compensation consulting firm. His determinations of reasonable compensation were not based on information contained in the proxy statements of public companies. Instead, his determinations were based on the Executive Engineering Compensation Survey, published by Dietrich Associates, Inc. Mr. Brennan's findings were based on the highest credible pay rates that he could find in surveys of actual total pay for like positions in like circumstances during the years at issue. He disregarded some data contained in the surveys either because he thought that the data may have been furnished by the individual petitioners in the present case or *417 because the reported compensation was at great variance with other reported rates of compensation. In addition to the Dietrich surveys, Mr. Brennan also researched and considered certain other surveys, but he decided not to rely on the other surveys because they were less precise in their breakdown of industry classification or because they reported compensation less than that reported in the Dietrich surveys. At trial, Mr. Brennan was adamant that his conclusions represented the maximum levels of reasonable compensation based on the sources that he had considered. Mr. Brennan is well qualified in his field, but we do not accept his conclusions. In the first place, his data reflected compensation paid to consulting engineers. Although the individual petitioners were consulting engineers, they were highly specialized and served the oil and gas industry. As such, they were engaging in unusually hazardous operations, and the oil and gas industry has generally been highly profitable and highly remunerative. Accordingly, we believe that a survey of compensation paid generally to consulting engineers may not adequately reflect the compensation to be paid to the individual petitioners. *418 Moreover, although Mr. Brennan testified that his figures included amounts for the value of stock options, it was not clear to us that such figures do reflect such values. There was no explicit statement of an amount allocable to the value of stock options, and those responding to the survey reported only relatively small stock option values. Both parties to this case agree that the value of stock options should be included in determining the amounts of reasonable compensation for the individual petitioners, and since we have doubt as to whether Mr. Brennan's conclusions do include such values, we have doubt about such conclusions. Mr. Brennan criticized the methods used in the Hansen report. However, we are convinced that A.S. Hansen, Inc., is highly qualified and experienced, and considerable weight must be given to its analysis and approach. Furthermore, the conclusions in the Hansen report as to cash compensation did not differ significantly from the recommendations of Mr. Brennan. In addition, the Hansen report was based on data that reflected experiences in the consulting engineering field and the oil and gas industry. Although production in the oil and gas industry is *419 a significantly different business than that of the petitioners', it seems appropriate to base the results on a mix of the figures from the oil and gas industry and from the field of consulting engineering. The method used in the Hansen report to compute the amounts allocable to stock options or other long-term compensation appears to be reasonable and appropriate. In our view, there is one significant flaw in the approach of the Hansen report. The authors of that report determined what would be reasonable compensation for Mr. Owensby if he was a full-time employee of O&K, if he was a full-time employee of PME, and if he was a full-time employee of TEST. They made similar computations for Mr. Kritikos. Obviously, these individuals were not full-time employees of each of those companies. They spent long hours and were responsible for the sales and management of the businesses, but they were not working full time for each of the businesses. A more realistic view is to consider the three companies as a single business for which Mr. Owensby, Mr. Kritikos, and Mr. Piner each worked. In the aggregate, it had annual revenues of between $10 and $30 million, and we have a sound basis *420 for comparing that business with the category of companies with revenues of between $10 and $30 million. The Hansen report did recognize that it might be appropriate to determine the reasonable compensation of the individual petitioners by treating the companies as an aggregate business, but when it did so, it determined their compensation by reference to the data in the category of the highest paying companies. That category involves businesses altogether dissimilar from the businesses of the petitoners. Instead, the report should have looked to the category of companies with revenues of $10 to $30 million a year. The Hansen report suggests total compensation for an outstanding employee in a company in that category of $546,376 for 1978 and $560,065 for 1979. We have concluded that those amounts constitute reasonable compensation for Mr. Owensby and Mr. Kritikos for those years. Since Mr. Owensby and Mr. Kritikos received compensation from the two corporations and TEST, we must decide how the total allowable compensation is to be allocated among those companies. For each of them, the total allowable compensation, $546,376, for 1978 is 64 percent of the total compensation paid *421 to each of them in that year, and accordingly, we conclude and hold that each of the corporations and TEST can deduct that percentage of the compensation paid to Mr. Owensby and Mr. Kritikos for that year. Similarly, for each of them, the total allowable compensation, $560,065, for 1979 is 66 percent of the total compensation paid to each of them for that year, and accordingly, we conclude and hold that each of the corporations and TEST can deduct that percentage of the compensation paid to Mr. Owensby and Mr. Kritikos for that year. Mr. Piner's situation presents several different considerations. He worked primarily for TEST, but he also did render some services for PME. Since we have concluded that the most appropriate method for determining the reasonable compensation for Mr. Owensby and Mr. Kritikos is to view the businesses as a single business, it also seems most appropriate to treat Mr. Piner as an employee of such business. Moreover, as it happens, if we were to determine his reasonable compensation by reference to the compensation paid to an executive in the category of companies with total revenues of less than $10 million, he would be entitled to reasonable compensation *422 in excess of that allowed for Mr. Owensby and Mr. Kritikos, and it is obvious that such a result would be entirely unrealistic. It would also be unrealistic to determine his allowable compensation by reference to that paid the third highest executive in the category of companies with total revenues of $10 to $30 million; that figure, for 1978, $363,415, and for 1979, $305,970, represents only a small part of the compensation allowed Mr. Owensby and Mr. Kritikos. It is obvious that in the operations of the businesses of the petitioners, Mr. Piner's services were considered much more valuable than that reflected by such percentage, and he received compensation more nearly equal to that of Mr. Owensby and Mr. Kritikos. Under these circumstances, we conclude and hold that the allowable compensation for Mr. Piner is to be determined by reference to the compensation approved for Mr. Owensby and Mr. Kritikos; that is, since the compensation paid to Mr. Piner in 1978, $779,300, was 91 percent of the total compensation paid to Mr. Owensby for that year, that percentage of the compensation allowed for Mr. Owensby for that year is allowable for Mr. Piner, and since the compensation paid to *423 Mr. Piner in 1979 was 62 percent of the compensation paid to Mr. Owensby for that year, that percentage of the total compensation allowed to Mr. Owensby for that year is allowable for Mr. Piner for that year. [16]
In conclusion, let us observe that we fully appreciate that Mr. Owensby, Mr. Kritikos, and Mr. Piner are unusually capable and dedicated workers, and that their efforts have resulted in highly profitable businesses. It is not our purpose to limit those profits in any way, and those individuals are entitled to and will share in the profits of their enterprises. Nevertheless, we must, as a matter of law, decide to what extent the earnings from their businesses can properly be paid to them as compensation and to what extent such earnings must be treated as the profits of their businesses with the resulting *424 tax consequences. It is our view that the individual petitioners are entitled to handsome compensation for their efforts, but it is also our view that in part the distributions to them represented profits in the nature of dividends from those businesses. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. The parties stipulated to this figure. PME's income tax return for its 1979 fiscal year shows total compensation for Mr. Owensby and Mr. Kritikos of $512,211 each.↩
3. The parties stipulated to this figure. TEST's income tax return for its 1979 fiscal year shows Mr. Piner's total compensation as $525,300.↩
4. May exclude executives whose gains from options exercised are reported for 5-year period only; may represent period other than calendar year. ↩
5. This figure was shown in the article as $2,307; however, the sum of $917 and $1,120 is $2,037. ↩
6. Includes amounts earned in 1978 under $1.5 million employment bonus. ↩
7. Retired Jan. 1, 1979. ↩
8. Resigned Dec. 31, 1979.↩
9. The parties stipulated to the figure $112,981. However, they also stipulated that the sum of $112,981, $299,981, and $46,185 is $458,658. In his notices of deficiency to Mr. Owenby and Mr. Kritikos, the Commissioner determined that $112,492 was reasonable compensation for each of them in 1979.↩
10. The petitioners do not make any argument concerning the last factor contained in Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court, namely that undercompensation in prior years justifies greater compensation in later years. The petitioners do argue that the Commissioner's failure to question the compensation practices of O&K, PME, and TEST during the audits conducted by him for 1976 and 1977 should be relied upon by us as evidence that such compensation practices were reasonable. However, such argument has been consistently rejected by the courts. Walker v. Commissioner,362 F.2d 140, 142-143 (7th Cir. 1966), affg. a Memorandum Opinion of this Court; Ward v. Commissioner,240 F.2d 184, 185 (6th Cir. 1957), affg. per curiam 25 T.C. 815 (1956); Caldwell v. Commissioner,202 F.2d 112, 115 (2d Cir. 1953), affg. a Memorandum Opinion of this Court; Rose v. Commissioner,55 T.C. 28, 31-32 (1970); Meneguzzo v. Commissioner,43 T.C. 824, 836 (1965); Savage v Commissioner,31 B.T.A. 633, 637 (1934), revd. on other grounds 82 F.2d 92 (3d Cir. 1936); but see Kennedy v. Commissioner,671 F.2d 167, 175 (6th Cir. 1982), revg. 72 T.C. 793↩ (1970).
11. This figure is the amount allowed by the Commissioner as reasonable compensation from O&K in 1978 in the notices of deficiency sent to Mr. Owensby and Mr. Kritikos. ↩
12. The "total" compensation figures recommended in the Hansen report are not the sums of the recommendations made for the three companies. Rather, such figures represent the Hansen report's recommendations for compensation if O&K, PME, and TEST are treated as single company. ↩
13. See n. 12.↩
14. At trial, the petitioners' attorney explained that the years 1978 through 1981 were used in their expert report because they had also been audited for 1981 and 1982, and consideration had been given to consolidating those years with the years before us in the present case.↩
15. According to the Hansen report, in these instances, the third highest paid individuals received more in the form of stock options than the second highest paid individuals.↩
16. We have determined the amounts that may be treated by the corporations and TEST as reasonable compensation for their taxable years. We expect that the parties can agree on appropriate allocations of such amounts to the taxable years of the individual petitioners for purposes of the computations under Rule 155 of the Tax Court Rules of Practice and Procedure.↩